## INLAND STEEL · CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 6837.

Circuit Court of Appeals, Seventh Circuit.

Jan. 9, 1940.

Ernest S. Ballard, Ralph E. Bowers, Frederic Burnham, and Herbert A. Friedlich, all of Chicago, Ill., for petitioner.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Ernest A. Gross, Bertram Edises, and Richard C. Barrett, Attys., all of Washington, D. C., for National Labor Relations Board.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here on a petition by the Inland Steel Company, a Corporation, (hereinafter referred to as "petitioner," "Inland" or "the company") pursuant to Section 10(f) of the National Labor Relations Act (49 Stat. 449, 29 U.S.C.A. §§ 151–166, hereinafter referred to as the "Act") to review and set aside a final order of the National Labor Relations Board, (hereafter referred to as the "Board") entered November 12, 1938 against the petitioner. The Board answers and prays for affirmance and enforcement of its order.

A charge and an amended charge having been filed jointly by the Steel Workers Organizing Committee, (hereinafter called the "SWOC") and the Amalgamated Association of Iron, Steel and Tin Workers of North America, Lodge Nos. 64, 1010 and 1101, (hereinafter called the "Amalgamated") the Board, on June 12, 1937, issued its complaint against the petitioner alleging that it had and was engaged in unfair labor practices affecting commerce within the meaning of Section 8 (1), (2) and (5), and Section 2 (6) and (7) of the Act. So far as here seems pertinent, the complaint, in addition to jurisdictional allegations, alleged that on June 8, 1937, the production, maintenance and transportation employees at both of petitioner's plants, (one located at Indiana Harbor and the other at Chicago Heights) exclusive of certain categories of employees, constituted a unit appropriate for the purpose of collective bargaining within the meaning of Section 9(a) of the Act; that on that date the majority of petitioner's employees in said unit had designated the SWOC as their representative for collective bargaining, and on and subsequent to June 8, 1937, petitioner, by refusing to enter into a signed agreement with the SWOC covering wages, hours, and conditions of employment, regardless of the terms proposed, had

refused and was refusing to bargain collectively with the representatives of its employees in violation of Section 8 (5) of the Act. It also alleged that petitioner, on or about April 14, 1937, dominated and interfered with the formation, and from that date to and including the date of the issuance of the complaint, actively supported, dominated and interfered with the administration of a labor organization of its employees known as Steel Workers Independent Union, Inc., (hereinafter called the "Independent") thereby engaging in unfair labor practices within the meaning of Section 8(2) of the Act. It further alleged that, beginning in July, 1936, petitioner had, by its officers and agents, urged and warned its employees to refrain from joining or retaining membership in the SWOC or the Amalgamated Lodges, thereby interfering with, restraining and coercing its employees in the exercise of the rights guaranteed them by Section 7 of the Act and thereby committing unfair labor practices within the meaning of Section 8 (1) of the Act.

On June 18, 1937, petitioner filed its answer specifically denying all violations of the Act as charged in the complaint.

The complaint came on for a hearing at Chicago, Illinois, on June 28, 1937,. before Charles A. Wood, designated by the Board as Trial Examiner, and continued until October 13, 1937. Independent was permitted to intervene on certain issues only, and has filed in this court its petition to review the Board's order insofar as it is affected thereby, and said petition is now pending as No. 7013. Independent's petition and the Board's answer thereto will be disposed of in this opinion.

The printed record before us contains more than 5000 pages, and a mere summary of the pertinent evidence, as it bears upon the numerous issues involved, is quite impractical within an opinion of reasonable length. Inasmuch as many of the questions in issue are dependent upon the evidence, we shall, when considering them, discuss such evidence as seems pertinent thereto.

On October 11, 1937, two days before the closing of the hearings before the Trial Examiner, the Board entered an order transferring the proceedings to, and continuing them before, the Board. Without any intermediate report by the Examiner, or any proposed findings of fact, conclusions of law, or order, and without briefs or oral argument, the Board, on April 5,

1938, issued its final decision, findings of fact, conclusions of law, and order. On May 4, 1938, Inland filed in this court a petition to review and set aside the Board's order. This petition, on motion of the Board, was dismissed by this court on June 4, 1938, 7 Cir., 97 F.2d 1006. Three days thereafter, the Board issued its proposed findings of fact, conclusions of law, and order, and gave petitioner leave to file exceptions and brief, and to be heard in oral argument. The proposed order was substantially the same as the one which had been entered previously and set aside. Thereafter, on November 12, 1938, after the submission of briefs by the respective parties and the hearing of oral argument, the Board issued its decision and order, including findings of fact and conclusions of law.

The decision of the Board determined:

(1) That the production, maintenance and transportation workers in both plants together[1] constituted a unit appropriate for the purpose of collective bargaining under Section 9 (a) of the Act.

(2) That on June 8, 1937, a majority of the employees of such unit had designated SWOC as their bargaining representative, and that SWOC was the exclusive representative of all the employees in this unit for the purpose of collective bargaining.

(3) That Inland had refused to bargain collectively with the SWOC because of its refusal to enter into a signed agreement governing terms and conditions of employment, even though an understanding was reached on such matters, and that such refusal was in violation of Section 8 (5) of the Act.[2]

(4) That Inland had dominated and interfered with the formation and administration of Independent and had contributed support to it and, by its illegal sponsorship of the Independent, had interfered with or coerced its employees in the exercise of their rights guaranteed by Section 7 of the Act, and had engaged in unfair labor practices within the meaning of Section 8 (1) of the Act.

Petitioner was ordered to cease and desist from—

(1) Dominating or interfering with the administration of Independent;

(2) Refusing to bargain collectively with SWOC as the exclusive representative of the employees found to constitute the appropriate unit; and

(3) Interfering with or coercing its employees in the right to self organization.

Petitioner was further affirmatively ordered to—

(1) Withdraw all recognition from the Independent as a representative of any of its employees for the purpose of the Act, and to completely disestablish the Independent as such representative;

(2) Upon request, bargain collectively with SWOC as the exclusive representative of the employees in the unit found to be appropriate, with respect to wages, hours and other conditions of employment; and

(3) "If an understanding is reached on such matter, embody such understanding in a signed agreement."

The Contested Issues.

(1) Whether or not Inland had been guilty of unfair labor practices within the meaning of Section 8 (5) of the Act.[3]

(2) Whether or not the decision of the Board fixing the appropriate unit for bargaining purposes is valid.[4]

(3) Whether or not the finding of the Board that Inland was guilty of unfair labor practices in violation of Sections 8

---

[1] This unit excluded supervisory and clerical employees, managerial and office help, timekeepers, technical engineers, technicians, draftsmen, chemists, watchmen, nurses, truck drivers and bricklayers.

[2] In this connection the Board found that such refusal caused a strike on May 26, 1937, which resulted in the closing of both plants until July 1, 1937.

[3] Under this issue Inland contends that it was never requested to bargain with the SWOC as exclusive bargaining agent of the unit found by the Board to be appropriate; that, the only dispute between the parties was the refusal of Inland to sign a written instrument of any agreement which might be reached; that the question of a written signed agreement is a matter itself for collective bargaining; that the SWOC at no time prior to the entry of the Board's order represented a majority of Inland's employees, and, that SWOC was not and is not a labor organization as defined in the Act.

[4] Under this issue, it is contended that the decision of the Board in this respect is not sustained by substantial evidence, and that the power to determine the appropriate unit, delegated to the Board by the Act, constitutes an invalid delegation of legislative authority.

(1) and 8 (2) of the Act, in that it fostered, actively promoted and otherwise encouraged the organization and growth of, and contributed financial and other support to the Independent, and discouraged membership in the SWOC, is supported by substantial evidence.

(4) Whether or not Inland received a full and fair hearing as required by law.[5]

Petitioner, in its brief, has first discussed the question presented by Contested Issue No. 4. We shall do likewise. An argument of great length is made in an effort to demonstrate that the Trial Examiner was so biased and prejudiced as to deprive Inland of a full and fair hearing. The Board, in its decision, makes no mention of this attack upon the Examiner, but in its brief insists that his conduct was characterized by complete impartiality with the single purpose of insuring a record which would fully and fairly present all aspects of the questions presented. We are unable, of course, to do more than summarize the numerous criticisms directed at the Examiner's conduct of the hearing.

At the commencement of the hearing, the Trial Examiner adopted the practice of interrupting counsel and witnesses, and compelling further argument or statements to be "off the record." The court reporter was forbidden to take notes of such "off the record" matter. When back "on the record," the Examiner would summarize what had taken place "off the record." Over objection of counsel, this practice continued during the first five days of the hearing, culminating in an incident which occurred on the afternoon of the fifth day, upon which great stress is laid. It seems that Inland, at its own expense, but at the request of the Board, had prepared a list of the names and occupations of 6135 employees, claimed by the Board to be members of the SWOC. This exhibit, no copy of which had been made, was introduced by the Board, and counsel for Inland asked leave to withdraw it. It was claimed by Inland it was important that it have the exhibit in the preparation of its case, but its request in this respect was denied by the Examiner. The next morning Inland brought to the hearing room its own reporter[5a] for the purpose of taking the "off the record" proceedings which the Examiner had directed the official reporter not to take. The Trial Examiner stated in effect, that Inland was not entitled to its reporter in the room for the reason the official reporter had a contract with the Government and a monopoly on the stenographic rights. The official reporter, after consulting with his superior, advised the Examiner to the effect that if the Examiner would permit him to transcribe the "off the record" material and furnish Inland with copies thereof, that he objected to any other reporter taking the proceedings. On the other hand, if the Examiner would not permit the official reporter to take the "off the record" matter, then he had no objection to the private reporter taking the same. Whereupon the Examiner forbid both the official reporter and Inland's reporter to take any "off the record" matter.[6]

Inland's counsel directed its reporter to continue taking notes, whereupon the Trial Examiner sent for a Deputy United States Marshal and had him ejected from the hearing. Thereupon, Inland's counsel withdrew from the hearing. Upon appeal to the Board by telegram, the Trial Examiner

---

[5] It is Inland's contention that the Trial Examiner's conduct of the hearings was so partisan and biased as to constitute a denial of due process, and that the Board placed improper and discriminatory limitations upon the issue of ordinary witness subpoenas in violation of due process.

[5a] The word "reporter" or "private reporter" as used in the discussion which follows is synonymous with stenographer and is to be distinguished from the "official reporter." What is said is not to be construed as limiting the right of the Board or a court to designate and control the latter.

[6] The statement by the Examiner and counsel is as follows:

Trial Examiner Wood: "I address myself to the reporter for respondent. You will be given permission to remain and transcribe only so long as you observe the rules of conduct or procedure in this hearing as laid down by the Trial Examiner. I instruct you specifically that when the Trial Examiner says, 'Off the record,' you will not transcribe. In other words, you will be bound by all the rules of the official reporter."

Mr. Ballard: "If the Examiner please, I want to be sure that the responsibility for this rests with the respondent and not the reporter. The reporter is under instructions from us to transcribe everything, and we consider it our legal right to have that done, and he will not desist or withdraw from the hearing room until he is compelled to do so."

was promptly instructed to permit the official reporter to take and transcribe all "off the record" material and to furnish Inland with such transcriptions. It is argued by Inland that this incident in itself demonstrates, in the early stages of the hearing, the non-judicial attitude and the bitter animosity which the Examiner had against Inland and, that he deliberately intended in his "off the record" remarks to influence the result and, at the same time, preclude a review thereof.

On the other hand it is argued by the Board that this incident merely illustrates the contemptuous behavior of Inland's reporter, supported by its attorneys. While in our opinion, both the reporter and counsel should have complied with the order and direction of the Examiner and preserved exceptions thereto, yet their failure in this respect is no defense. In fact, it is entirely beside the point. The Board also seeks to justify the Examiner's conduct, not only by specific provision of the Board's rules and regulations, but by his inherent authority to maintain order in an administrative proceeding. Neither do we think this argument is pertinent. It is our opinion that the act of the Examiner in refusing Inland's request to have its own reporter present for the purpose of taking and transcribing the proceeding was unwarranted and inexcusable. That he was in error in directing the official reporter to omit the "off the record" matter, was recognized by the Board by their prompt action in directing the Examiner to reverse his ruling in this respect. But this action of the Board does not answer Inland's contention that it was entitled to its own reporter as a matter of right. We think this contention must be sustained. A public hearing was in progress in a room in a Federal building with a seating capacity of 300 persons. It is inconceivable to us that any interested party should be refused the right to have present their own reporter for the purpose of making a record of everything said during the hearing. Of course the record made by such reporter would not be official, and just how and in what manner it could be used was the sole concern of Inland, and not the Examiner. The only authority called to our attention bearing upon the matter is that of Coulston v. United States, 10 Cir., 51 F.2d 178, on page 180, where the court said: "* * * Trials are not officially reported in the national courts; if either party de-

sires a stenographic report as an aid in the preparation of the bill of exceptions, or of his assignments of error, or for any reason he has the absolute right to have a stenographer present for that purpose; but the responsibility is upon the parties to provide themselves with such a record. * *"

The lack of further authority, no doubt, is due to the fact that the right has been generally, if not universally, recognized in all courts. True, as pointed out, the conduct complained of included only the first five days of the hearing. The argument, however, that little, if any, damage could have resulted to Inland, is of no consequence. The conduct of the Examiner in this respect is relied upon as disclosing his hostile attitude, and we think there is merit in this contention. While we do not attach as much importance to the incident as Inland would have us do, yet we are convinced that the circumstance indicates an erroneous conception on the part of the Examiner which resulted in the deprivation of a substantial right.

Another attack made upon the Examiner arises from his alleged hostile and coercive examination of witnesses. It is argued his conduct in this respect demonstrates that he was acting as a partisan on the Board's side, rather than in a judicial capacity. Many pages of petitioner's brief are directed at this criticism, where we are cited to numerous pages of the voluminous record in support thereof. After reading and studying the instances specifically called to our attention, as well as other portions of the record, we are forced to the conclusion that the conduct of the Examiner in this respect plainly discloses he laid aside all semblance of serving in a judicial capacity. It seems impossible, within the limitations at our disposal, to set forth the language of the examination of witnesses by the Examiner from which our conclusion in this respect is reached. To obtain the complete picture requires a reading of the record.

During the hearing, the practice followed consisted of a direct examination by the party who introduced the witness, a cross-examination by the opposite party, followed by an examination by the Examiner. We think it can be stated as a general proposition (there may be exceptions) that the Examiner devoted very little time to the examination of important witnesses favorable to the Board, while on the other hand, his examination of important wit-

nesses for Inland was of great length, indulged in apparently for the purpose of impairing the credit or weight to be attached to their testimony. For instance, the testimony of the Board's witness, Bittner, the Regional Director of SWOC, covers 135 pages of the record, with no separate examination by the Examiner, and only an occasional interruption. The witness Maihofer, President of one of the Amalgamated Lodges, also an important witness for the Board, testified in chief and on cross-examination to the extent of 69 pages of the record. His examination by the Examiner covers 8 pages. The witness Saposs, the Chief Economist of the Labor Board, whose testimony covers around 180 pages of the record, seems to have been subjected to no independent examination by the Examiner, although the record discloses interruptions by the Examiner during the course of his principal and cross-examination. On the other hand, when it came to the important witnesses for Inland and the Independent, the Examiner became an active and vigilant cross-examiner. The testimony given in direct and cross-examination by the witness Sykes, one of Inland's chief executives, covers around 289 pages of the record, during which it seems he was interrogated as to every conceivable point material to the case. Following this, the record discloses 99 pages of examination by the Examiner. [7]

The witness Stone was used by Inland to answer the economic and historical testimony of the Board's witness Saposs. His examination in chief and on cross, consumes 156 pages of the record, and then follows the examination by the Examiner, covering 58 pages. The witnesses Walsh, Works' Manager of Inland at Indiana Harbor, and Gillies, both important witnesses for Inland, were likewise examined by the Examiner at great length. The witness Cutting, one of the organizers of Independent, was interrogated by the Examiner for more than six hours. This examination covers 130 pages of the record. At its conclusion, the Examiner suggested that the witness should be indicted for perjury. The testimony of this witness was material in behalf of the Independent, and it is a fair inference that the Examiner was disappointed after his long and arduous examination in that he had been rather unsuccessful in impairing the effect of the testimony given by the witness.

We set forth in a footnote[8] extracts from the Examiner's examination of witnesses Hill, [(a)] Burson, [(b)] and Adams. [(c)]

---

[7] Typical of such examination is the following, copied from a page in the record:

"Q. So far as signing a written contract, Walsh functioned as messenger boy, is that correct? A. No, not as messenger boy. Walsh functioned as one of the members who would naturally be consulted; although not a member of the executive committee, one of the men who would be consulted on a problem of that kind.

"Q. Why didn't some one with real authority discuss the matters with Bittner? A. Mr. Walsh had all the authority we thought necessary.

"Q. He had no authority to enter into a written agreement, did he? A. He had authority—

"Q. Answer yes or no. A. He was told not to enter into a written agreement by the committee in the meeting or conference on May 24th.

"Trial Examiner Wood: Read the question, Mr. Reporter.

(The question referred to was read by the reporter, as follows: "He had no authority to enter into a written agreement, did he?")

"The Witness: Not after the meeting of May 24th of the executives.

"Q. (By Trial Examiner Wood.) Did he before? A. He might have assumed it.

"Q. Did he have it? A. Mr. Walsh and other executives of the Inland Steel Company have no closely circumscribed authority.

"Trial Examiner Wood: Read the question, Mr. Reporter.

(The question referred to was read by the reporter as follows: "Did he have it?")

"Mr. Ballard: I submit the witness has answered.

"Trial Examiner Wood: Let him answer again, please.

"The Witness: As I have stated previously, Mr. Examiner—

"Trial Examiner Wood: Let me rephrase my question.

"Q. (By Trial Examiner Wood.) At any time prior to May 25th, did Walsh have authority to enter into a written agreement? A. Mr. Walsh might have assumed that authority.

"Q. Did he have it? A. That question has never been raised with the executives.

"Q. Did he have it?

"Mr. Ballard: I think the Examiner is now asking a legal question. The witness has stated the facts."

[8] (a) "Q. Hill, you are an R. A. & I. man, are you not? A. What is that?

"Q. You are an R. A. & I. man, are

Inland called around 700 witnesses, included by the SWOC in its membership list for the purpose of proving that such witnesses had resigned from the SWOC and joined the Independent prior to June 8, 1937. The direct examination was brief generally, and related solely to the situation stated. Counsel for the Board was per-

---

you not? A. I don't know what that is.

"Q. Have you ever done any industrial service work? A. No, sir.

"Q. None whatever? A. No, sir.

"Q. Do you know what 'dry cleaning' means? A. No, sir.

"Mr. Friedlich: What what means? I did not hear you.

"Trial Examiner Wood: Dry cleaning.

"Q. Do you know what money outside of a regular salary means for espionage work? A. Certainly.

"Q. What is it called? A. I couldn't tell you.

"Q. You just said 'Certainly.' A. Well, that is getting payment of money under two jobs, that is the way I mean.

"Q. I asked you what it was called and you said 'Certainly,' you knew. What is it? A. Well, I don't know.

"Q. You have never participated in any industrial investigation, so-called? A. No, sir, I haven't.

"Q. Never been employed by a detective agency in your life? A. No, sir.

"Q. Every time you go to an employment office in a steel company to sign up for a job you list all of the firms for which you ever worked, don't you? A. Not all of them in that way.

"Q. You usually list your past employment when you apply at a steel office? A. Certainly.

"Q. And you found that your short experience with so many companies have been a recommendation so far as personnel is concerned, have you not? A. No, I think that is taken under the wrong light. I have worked at a lot of these different places on construction jobs and that is the reason some of them were of such a short duration.

"Q. What explanation have you for the shortness of your work in so many steel companies apart from that?

"Mr. Friedlich: I object, if the Examiner please. I should have objected earlier but I think this spy phobia has probably gone far enough and I think the Examiner on consideration will agree with me. In any event, I object.

"Trial Examiner Wood: Counsel, if you will please give way to my much broader experience in this field than yours.

"Mr. Friedlich: Well, I will be very glad to do it but I will have to stand on my objection unless it is overruled.

"Trial Examiner Wood: Your objection is overruled.

"Mr. Friedlich: Exception.

"Trial Examiner Wood: Account for your great number of employers and the short time, other than construction.

"The Witness: Well, there was some of the jobs that I quit, I wasn't satisfied, other than ones that the jobs were finished, some of them I obtained better paying positions.

"Trial Examiner Wood: That is all.

8 (b) * * *

"Q. What other steel companies have you worked for? A. Let's see,—none. This is the first steel mill I have worked in.

"Q. What industrial service work or industrial investigation work have you done? A. What do you mean?

"Q. Don't you know what industrial investigation work is? A. Investigation?

"Q. You don't understand my question? A. I don't understand the word 'industrial investigation.'

"Q. All right. What spying have you done? A. Spying? No, I never done no spying.

"Q. Have you ever taken a job where you write reports in addition to your work? A. Never.

* * *

8 (c) "What is your name? A. Charles Adams.

"Q. You have been having a lot of difficulty with your handkerchief and your bottle that you have been clutching and contortions. Isn't it a fact that your cold is a fake? A. No.

"Q. No?

* * *

"Q. You are an operative? A. Sir?

"Q. Do you know what an operative is? A. I can't hear you.

"Q. Are your ears bad, too? A. Yes.

"Q. They are? A. Yes.

"Q. Have they become bad since I started to ask you questions? A. No, it is due to this cold. I have a very bad throat and I have to go to the doctor tonight, the Inland doctor in Hammond. He has also told me not to work.

"Q. How do you account for all the jobs you have had in the last two years? A. Well, if I find it necessary I will bring in the records, if you want me to come in when I talk better.

"Q. Have you answered my question? A. Sir?

"Q. Have you answered my question?

"Trial Examiner Wood: Read my question.

(Question read)

"The Witness: On account of tem-

mitted to cross-examine such witnesses in great detail, not merely as to what they knew concerning the subject matter of the examination, but as to what they thought or believed was the attitude of Inland with reference to the Independent. Many times during the examination of such witnesses, the Trial Examiner commented that the witness was "evasive" or "unsatisfactory," or that he "obviously understands and does not care to answer." The witness Xurafes, who evidently expressed himself with difficulty in English, is cited as illustrative. Extracts from his cross-examination are given in a footnote. [9] The Examiner characterized such witnesses as "evasive." On one occasion, he stated: "My considered opinion, after listening to 200, is that the witnesses have been deliberately evasive on that particular question, deliberately."

Some of these witnesses were interrogated by the Trial Examiner as to who paid for their bus fare and lunch when they came to Chicago to testify, and whether or not liquor was furnished them or their fellow employees.

It is argued by petitioner that the nature of the cross-examination and the characterization of witnesses by the Trial Examiner was such as to intimidate them and to adduce improper evidence useful to the purpose of the Board. We think it was calculated to have such effect. In fact, the witness Hokanson was pressed to the point where he stated: "I didn't have an opinion at the time, as I said before, but you are forcing me to say whether I had, and really at the time I signed the card, I didn't have any opinion as to the company's feelings."

porary law-offs mostly and they transferred us around, see, from one department to another rather than lay us off entirely.

"Q. What has that to do with the question I asked you?

* * *

"Q. What were you told about the petition when you signed it? A. What was I told about the petition?

"Q. You understood. A. Nothing in particular.

"Q. Did you know what you were signing? A. Well, not exactly at that time.

"Q. Well, what did you find out later as to what you had signed? A. I found out it was O. K., that is all. I found out it was O. K., the petition was.

"Q. What did you sign, what was the petition for? A. For the Independent Union.

"Q. What were you told about what the petition was for? A. Well, I just don't remember exactly the words he told me. As near as I can remember it was a company union and a good benefit for anyone wanting to hold their jobs.

* * *

"Q. What industrial investigation have you done? Why do you hesitate? A. None at all.

"Q. You never worked for any detective agency? A. No, sir.

"Q. R. A. and I.? A. No, sir.

"Q. You know what I mean? A. Yes.

"Trial Examiner Wood: That is all.

"Mr. Burnham: That is all.

"Trial Examiner Wood: The Trial Examiner will comment that the demeanor of this witness is highly unsatisfactory."

9 * * *

"Q. At the time that you went up to the offices of the Independent union, in your own mind did you think that the company was for or against the C. I. O.? A. Well, I never know anything about it.

"Q. My question is, 'What did you think in your head?' A. I never think.

"Q. You didn't think at all about this? A. No.

"Trial Examiner Wood: The witness has answered that he never thinks, counsel. Certainly you should be satisfied with that.

"Q. (By Mr. Dorfman.) When you go up to the offices of the Independent union— A. Yes, sir.

"Q. (Continuing.) —you think company like Independent or no like? A. Well, I don't know that.

"Q. What you think in your head? A. What company?

"Q. Inland Steel Company. A. Well, I think they like it, the Independent.

"Q. At that time you think company like or no like C. I. O.? A. I don't know.

"Q. What you think in your head?

* * *

"Q. (By Mr. Dorfman.) I ask you question again. At the time that you went to offices of Independent union,— A. Yes, sir.

"Q. (Continuing.) —what you think in your head, company like or not like C. I. O.? A. That is all, I don't know nothing.

"Q. But what you think? A. I don't think nothing.

"Trial Examiner Wood: Let it go. Let it go. The witness obviously understands and does not care to answer that."

* * *

Another situation cited as disclosing the unfair attitude of the Examiner, has to do with the testimony of Margaret Vevurka and Margaret Warner. Because of the uncertainty of the date when many of the 700 witnesses resigned from the SWOC and joined the Independent, these two witnesses, who were in the office of the Independent, testified with reference to the application cards issued to members of that organization. The letters "C. I." referred to "Card Issued" and were written in ink under the date of issuance. The Examiner propounded many questions during the original and cross-examination of these witnesses, and his own independent examination of the witness Vevurka occupies 38 pages of the record. It is apparent, from a reading of the examination of these two witnesses, that the purpose of the Examiner was to discredit their testimony. For instance, he required the witness Vevurka to write the letters "C. I." together with the date, eight times on a piece of paper. He required the witness Warner to do likewise. She then was asked to turn the paper over and write the same letters several times more on the back of the sheet. He then stated: "The Trial Examiner will comment that the two specimens offered by the witness Warner indicate to the Trial Examiner, with the little experience he has had in comparing writings, that the first was an attempt to make 'C's' different from those normally made by the witness."

Shortly after these two witnesses had testified, there was called by the Board the witness James, Recording Secretary of Amalgamated Lodge No. 1101, and following him, the witness Formentini, both of whom testified concerning a strike resolution appearing in the lodge record. It appears that the date of the meeting at which this resolution was passed, as well as the phraseology of the resolution, was regarded as important by the Board. Petitioner's counsel cross-examined these witnesses at some length and it was claimed the record had been intentionally altered shortly before the hearing for the express purpose of benefiting the Board's case. A reading of the testimony of these witnesses convinces us that the record had been tampered with and we think it is a reasonable inference it was done for the purpose charged. Notwithstanding this situation, the Trial Examiner apparently was not concerned with the situation—at any rate he made no effort to discredit their testimony. His complacent attitude in this respect was in striking contrast to that exhibited by him only a short time before with reference to petitioner's witnesses, Vevurka and Warner. It is difficult to reconcile his attitude in this respect except upon the theory that his purpose was deliberately to discredit the testimony of petitioner's witnesses concerning an important record, while at the same time refrain from saying or doing anything to disparage witnesses who had given testimony of a dubious nature concerning a record regarded as important in support of the Board's case.

Petitioner also complains of the unfair limitation placed upon cross-examination, or rather the unlimited cross-examination permitted Board's counsel of petitioner's witnesses. There is some merit in this criticism, but we shall not enter into any detailed discussion. Early in the hearing the Examiner announced, in effect, that petitioner's cross-examination of the Board's witnesses would be limited strictly "to proper cross-examination." On numerous occasions, objections were sustained on the theory that the questions did not pertain to the subject matter of the examination in chief. Later in the hearing, and after the witnesses of petitioner were being introduced, the Examiner apparently changed his attitude and in many cases permitted an unlimited cross-examination. On one occasion, there appears in the record an eight-page colloquy between the Examiner and petitioner's counsel concerning the limits of cross-examination. Petitioner's counsel insisted that inasmuch as they had been limited to "proper cross-examination" of the Board's witnesses, the same rule should be applied to Board's counsel in the cross-examination of petitioner's witnesses. The Examiner held in effect, however, that in an administration hearing, the matter was in the discretion of the Examiner and, that counsel for the Board would be permitted to cross-examine beyond the subject matter of the direct examination. During the course of this colloquy, the Trial Examiner warned counsel: "Mr. Ballard, if you are making any statement which goes to the conduct of this hearing by this Trial Examiner, of course, I shall feel free to make whatever observations I feel are warranted under the circumstances as to trial tactics of counsel for the respondent."

Another ground upon which petitioner argues it was deprived of a full and fair hearing is that it was denied the privilege of ordinary witness subpoenas. At

the outset of the hearing, the Trial Examiner ruled that such subpoenas would be issued to petitioner only upon written application containing specifications of "the name of the witness and the nature of the facts to be proved." The Board takes the position that this ruling of the Examiner was in compliance with Article II, Section 21 of the Rules and Regulations of the Board.[10] Petitioner's position is that this rule, when fairly construed, has application only to subpoenas duces tecum and not ordinary subpoenas. We do not think the rule is susceptible of such construction—in fact, it plainly reads otherwise. The Board also argues that the rule does not apply to it because it is not a party to the proceedings. We do not think it is necessary for us to determine whether or not this position is sound. The fact is, the rule was not applied to counsel for the Board and, therefore, he was not required to file such application. When petitioner raised the question early in the hearing, counsel for the Board stated: "That the rules and regulations do not provide that the Board must apply to itself for subpoenas; that to construe the rules in that manner would be ridiculous; and that for both of those reasons the practice is that the Board does not apply to itself for subpoenas."

Assuming that counsel for the Board correctly appraised the situation, and we think it did, it discloses the unfairness of the procedure employed. It also illustrates, in a minor fashion, what this record, as a whole, convincingly discloses—that is, the danger of imposing upon a single agency the multiple duties of prosecutor, judge, jury and executioner. The further assumption that the ruling of the Trial Examiner was in compliance with the Board's rule, does not improve the situation—it merely shows the rule itself is unfair and discriminatory.

Under the procedure followed, petitioner was required to make application for subpoenas, not to the Examiner or a Regional Director, but to the Board or a member thereof in Washington, specifying the "name of the witness and the nature of the facts to be proved by him." How the Board in Washington, or a member thereof, could be in a position to determine the materiality of "the nature of the facts to be proved," especially where the issues were as numerous and complicated as they were in the instant case, it is difficult to understand. Waiving aside this thought, however, a burden was placed upon one side which did not exist as to the other in the matter of obtaining witnesses. The situation may be aptly stated thus: Petitioner, in order to obtain a subpoena, was required to present to its opponent[11] an application therefor with notice as to what it expected to prove by the witness desired to be subpoenaed. Thus, it was within the discretion of the Board (the prosecutor, if not a party) to determine when process should issue in favor of the one to be condemned.

The Board argues that due process of law does not require the right to unqualified process, but that such right is amenable to reasonable regulations. Rev.St. Sections 876, 28 U.S.C.A. § 654, and § 878, 28 U.S.C.A. § 656, are cited in support of this argument. The former has to do with subpœnas in civil cases for witnesses living out of the District and at a distance of more than 100 miles from the place of trial. The issuance of process in such cases is within the discretion of the court. There, however, the court is not a party to the litigation and the requirement of the statute is equally applicable to both sides. The latter provision refers to indigent defendants and is not a limitation upon his right of process, but merely places in the court the discretion of allowing such process before the expenses incurred in connection therewith can be charged to the Government. Neither of these sections affords any support to the reasonableness of the instant regulation.

It is further argued by the Board that petitioner's complaint is without merit because there is no showing that evidence favorable to it was excluded. This argument begs the question. We are not now

---

[10] Applications for the issuance of such subpœnas may be filed by any party to the proceedings with the Regional Director, or, during the hearing, with the Trial Examiner. Such applications shall be timely and shall specify the name of the witness and the nature of the facts to be proved by him, and must specify the documents, the production of which is desired, with such particularity as will enable them to be identified for purposes of production.

[11] While it is argued that the Board is not a party to the proceedings, yet for the purpose under discussion, we think it must be considered as such. Throughout the record we find references such as "witness for the Board," "Counsel for the Board," "Argument for the Board" and the "position of the Board."

considering the extent to which petitioner was prejudiced, but whether it was, by such procedure, deprived of a substantial right, or whether the procedure employed placed it at a disadvantage in contrast with its opponent. It is also argued that the rule is reasonable because petitioner, under Section 10 (e) of the Act, has a right to make application to this court to adduce additional evidence. This argument also is not tenable. Such provision has no bearing upon what we regard as an unreasonable and unfair restriction upon petitioner's right to the process of subpoena.

Near the conclusion of the hearing, a colloquy took place between the Trial Examiner and counsel for petitioner, the material portion of which we set forth in a footnote.[12] Counsel for petitioner insists this statement by the Examiner was tantamount to a confession of prejudice by him, while the Board argues that it merely indicates a purpose on his part to preserve the record for determination on the merits. While we have no way of knowing, of course, just what induced the Examiner to make such a statement, to us the natural inference is that he realized the record was subject to attack because of his biased conduct and sought to forestall such attack by threatening counsel with exposure or counter-attack. At any rate, his statement is consistent with and lends support to our conclusion that petitioner was deprived of the character of hearing to which by law it was entitled.

The Act authorizes the Board to enter an order upon a complaint alleging unfair labor practices, only after a "hearing." This must mean a trial by a tribunal free from bias and prejudice and imbued with the desire to accord to the parties equal consideration. There is perhaps no more important right to which litigants are entitled than that they be given such a trial. Its impairment, ipso facto, brings the court, and administrative bodies as well, into public disrepute, and destroys the esteem

and confidence which they have enjoyed so generally. Time and experience have demonstrated that the public, as well as litigants, will tolerate the honest mistakes of those who pass judgment, but not the biased acts of those who would deprive litigants of a fair and impartial trial. Foremost among the responsibilities imposed upon a reviewing court, is to make sure that this foundation of our Judicial system be not undermined.

That a trial by a biased judge is not in conformity with due process is sustained by the authorities. In Tumey v. Ohio, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749, 50 A.L.R. 1243, the court said: "* * * No matter what the evidence was against him, he had the right to have an impartial judge. * * *"

The court, in Jordan v. Massachusetts, 225 U.S. 167, 176, 32 S.Ct. 651, 652, 56 L. Ed. 1038 said: "Due process implies a tribunal both impartial and mentally competent to afford a hearing. * * *"

The principle is aptly stated in People v. Naimark, 154 App.Div. 760, 139 N.Y.S. 418, 420, where it is said: "* * * The first idea in the administration of justice * * * is that a judge must necessarily be free from all bias and partiality. He cannot be both judge and party, arbiter and advocate in the same cause. Mankind are so agreed in this principle that any departure from it shocks their common sense and sentiment of justice."

And the fact that the court's judgment may be justified on the merits does not obviate the requirement of a fair trial. As was said in Union Pacific R. Co. v. Syas, 8 Cir., 246 F. 561, at page 568: "* * * But no judgment is just, if not obtained by due process of law; otherwise, courts could enter judgments without trial. * * *"

The recognition of the principle is as essential in proceedings before administrative agencies as it is before courts. As was said in Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, at page 304,

---

[12] "* * * Trial Examiner: Now, I would like to be perfectly candid and frank with counsel for Respondent. I am going to make a statement at the close of this case about the conduct of counsel if there is going to be future use of the record, either statistically or otherwise, to attack the record on prejudice. * * *

"Mr. Burnham: Well, I can say with equal candor here that there will un-

doubtedly be some reference made. Just the manner in which it will be made is something that I cannot say now.

"Trial Examiner Wood: In other words, your position is this, that your attack as a professional matter will be as broad as you can make it?

"Mr. Burnham: Yes.

"Trial Examiner Wood: I am much happier to have everyone frank about it.

"Mr. Burnham: Yes."

57 S.Ct. 724, at page 730, 81 L.Ed. 1093: "* * * Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed. All the more insistent is the need, when power has been bestowed so freely, that the 'inexorable safeguard' [citing case] of a fair and open hearing be maintained in its integrity. [Citing cases.] The right to such a hearing is one of 'the rudiments of fair play' [citing case] assured to every litigant by the Fourteenth Amendment as a minimal requirement. [Citing cases.] There can be no compromise on the footing of convenience or expediency, or because of a natural desire to be rid of harassing delay, when that minimal requirement has been neglected or ignored."

The rule is again clearly stated in Morgan v. United States, 304 U.S. 1, 14, 58 S. Ct. 773, 999, 82 L.Ed. 1129.

█ The Board argues that even though the criticism directed at the Trial Examiner be justified, yet the order should not be set aside because petitioner has failed to prove that its case was prejudiced, or that any evidence favorable to it was kept from the record. It is further argued that the transfer of the proceedings to the Board with no intermediate report on the part of the Examiner is conclusive against petitioner. We are not impressed with either of these arguments. To say that petitioner was not prejudiced because of the unfair and biased manner in which the case was tried by the Trial Examiner, is purely a matter of speculation. We shall not reiterate what we have heretofore said in connection therewith. We merely call attention to the fact that during the first five days of the hearing, certain of the proceedings were "off the record." What they consisted of is impossible of determination. Likewise, there is no way of ascertaining the disadvantage occasioned petitioner by the requirement imposed upon it with reference to obtaining the process of subpoena. Neither can the effect had upon witnesses produced by the hostile attitude of the Examiner, be measured. If dealing in assumptions, we would assume that the witnesses for the Board were encouraged and perhaps emboldened, while those for petitioner were discouraged, if not actually intimidated. It is true, the Board ordered the proceedings transferred to it even before the hearing was concluded and, thereafter, the case was decided without an intermediate report by the Examiner. But we are unable to comprehend how the Board could restore to the petitioner a right of which it had been deprived by the Trial Examiner—that is, a fair and impartial hearing. In fact, the Board, in its decision, made no mention of the charge of bias directed against its Examiner, and this, notwithstanding that the matter was fully presented to it in oral argument. The Court, in Montgomery Ward & Co. v. National Labor Relations Board, 8 Cir., 103 F.2d 147, on page 156, considered a situation similar to the one here presented, and we agree with the statement made: "This fault runs throughout the hearing. These matters were called to the attention of the Board in exceptions filed to the intermediate report of the examiner. They were not recognized nor rectified in any instance. We see no way in which the injustice done by this character of hearing can be righted except by setting aside the order of the Board in entirety and remanding the case to it for a new hearing before another examiner and a determination by the Board upon the record to be made upon such new hearing. The delay necessary to a new hearing is regrettable but avoidance of delay cannot justify a tolerance of violation of rights fundamental in the administration of justice."

█ Subsequent to our conclusion that Inland was not accorded a fair hearing, and the writing of our opinion in connection therewith, there was presented by Inland a motion for leave to file a transcript of a hearing held December 19, 1939, before a Special Committee of the House of Representatives investigating the Board and the operation of the Act, which it is claimed supports the contention that Inland was denied a fair hearing. This motion was denied for the reason that we find no authority in the Act which authorizes a record to be presented in the manner sought.

█ In view of the conclusion reached, it seems no good purpose could be served in a further consideration of issues presented which are dependent upon findings of fact as made by the Board. Such issues are presented in what has been designated as Contested Issues Nos. 2 and 3 (heretofore stated). We think, however, we should not conclude without some consideration of the issue presented by Contested Issue No. 1, which involves the question as to whether Inland had been guilty of unfair labor practices within the meaning of Section 8

(5) of the Act. The determination of this question depends largely upon the further question as to whether or not Inland was under a statutory obligation to sign a written agreement. This issue is improperly stated by the Board [13] for the reason that Inland did not refuse to consider the making of a signed agreement, but on the other hand refused only after the question had been given consideration.

The facts material to this question are not seriously in dispute. We summarize them as follows: In April, 1937, Maihofer, President of one of the Amalgamated Lodges at the Indiana Harbor plant, met with Walsh, Inland's work manager, and requested an agreement similar to that signed by the SWOC with Carnegie-Illinois Steel Company. Walsh referred the copy of this agreement to Inland's counsel. On May 4, 1937, Bittner, Reginal Director of SWOC wrote to P. D. Block, President of Inland, enclosing a copy of the same agreement, requesting a conference for the purpose of negotiating a joint wage agreement to promote industrial and economic relationships among the employees of Inland, who were members of his Union and Inland's. At the suggestion of Walsh, a meeting was held on May 14, 1937, between Bittner and Fontecchio of the SWOC, and Walsh and DeHoll, representing Inland. The purpose of this meeting and the principal matter discussed was whether Inland would sign a contract with SWOC. While wages, hours and working conditions were mentioned, the representatives of SWOC seem to have raised no question but that they were as good or better than those described in the Carnegie-Illinois agreement. Walsh told the conferees that he had no authority to state Inland's position on the question of a signed agreement. He promised that the question would be presented to Inland's executive officers at an early date. Subsequently, a meeting was arranged between the representatives of the two groups for May 25, 1937. In the meantime, a meeting of the executive officers, directors and attorneys of Inland was held for the purpose of determining Inland's policy. The officials were in disagreement as to what its policy in this respect should be, but finally reached the conclusion that Inland would not sign a contract with SWOC. At the May 25th meeting, the representatives of SWOC were advised that Inland had definitely decided not to sign a wage agreement. At this meeting, the attention of Bittner was called to the published statement of Inland's labor policy, to which Bittner made certain minor objections, but without any counter proposals. Bittner stated at this meeting that the entire effort of SWOC was to negotiate certain wage agreements, "signed, sealed and delivered" and, that if Inland had decided not to sign an agreement, there was no necessity for any further negotiations. On June 8th, P. D. Block, President of Inland, received a telegram from Bittner [14] to which, on the same date, a reply was made.[15] Prior to the receipt of this telegram there had been no claim by SWOC that it represented a majority of Inland's employees, or that it had the right to bargain as exclusive representatives of all such employees. The Carnegie-Illinois contract, referred to, was not an exclusive bargaining agreement, but merely one granting bargaining rights to the SWOC with respect to its own members.

---

[13] This issue is stated thus: "Whether, under the circumstances of the present case, petitioner's refusal to consider the making of a signed agreement with the S.W.O.C., regardless of the acceptability to it of the terms proposed, constituted a refusal to bargain collectively within the meaning of Section 8 (5)."

[14] "The Steel Workers Organizing Committee Claims to Represent a Majority of the Workers in Your Plants Located at Indiana Harbor and Chicago Heights and Is Prepared to Prove It to You by a Check of Its Own Books and Membership Cards Against Your Payroll Since the Steel Workers Organizing Committee Represents a Majority It is Entitled Under the National Labor Relations Act to Bargain Collectively with You as the Exclusive Representative of All Your Employees We Therefore Demand That You Immediately Set a Time and Place for Collective Bargaining Negotiations Look Toward a Signed Agreement As Required Under Said National Relations Act Please Advise."

[15] "Acknowledging on Behalf of Mister P D Block Your Telegram I am Sure You Will Recall That at Our Last Conference I Made It Entirely Clear That We Would Meet with the Steel Workers Organizing Committee at any Time for Purposes of Collective Bargaining But That We Did Not Propose to Make a Signed Contract with That Committee and That the National Labor Relations Act Does Not Require the Signing of a Contract Stop That is Still Our Position."

From this statement of facts, it definitely appears that at no time was there any controversy between Inland and SWOC as to wages, hours of employment or working conditions, nor was there any effort on the part of SWOC to negotiate with reference thereto. True, a copy of an agreement between Carnegie-Illinois Steel Company and SWOC was presented to Inland as a basis for negotiations, but it also appears there was no controversy as to the terms contained therein—in fact, working conditions at Inland were more favorable to the employees than those provided in that contract. As stated by Bittner at the meeting of May 25th, the purpose of SWOC was to negotiate agreements "signed, sealed and delivered." That no other purpose was sought to be accomplished is further evidenced by the language contained in the exchange of telegrams of June 8, 1937. Again, SWOC demanded that a time and place be set for collective bargaining negotiations looking "toward a signed agreement as required under the National Labor Relations Act," and also again, Inland, by its reply, expressed a willingness to meet with SWOC at any time for the purpose of collective bargaining, but again reiterated its refusal to make a signed contract for the reason "that the National Labor Relations Act does not require the signing of a contract." Thus, at that time, the issue was squarely joined as to whether a signed contract was required by the Act. Both parties apparently regarded the issue as of vital importance. On the day following the meeting of May 25, 1937, when SWOC was advised that Inland had decided not to sign a contract, a strike was called which continued from May 26th to July 1st. On June 9, 1937, the day following the exchange of telegrams, SWOC filed a charge with the Board against Inland, and three days later the complaint herein issued. Thus, it appears that in order to settle this admittedly legal question, a strike was called, with all of its attendant hardships, and a proceeding was instituted which required several months to hear and determine.

It is petitioner's contention that the Act contains no express provision requiring a signed agreement and that there is no basis whatever for such requirement unless it be an integral part of the term "collective bargaining." On the other hand, after a careful study of the Board's decision, as well as the argument found in its brief on this point, we must admit we are not certain as to the Board's position. In its decision, in discussing petitioner's claim that it "bargained to an impasse on the question of signing," we find this statement: "This contention can only be valid if the question of signing was, under the circumstances, a subject matter for negotiations—in other words, a concession which the respondent could withhold in consonance with its duty to bargain collectively in good faith. We do not believe that to have been the case."

In its brief, it is stated: "* * * Since, therefore, the embodiment of agreed terms in a signed agreement was, under the circumstances, an obligation plainly imposed by the statute itself, it is obvious that the matter was not and could not be the subject of 'bargaining' between the Union and petitioner."

Thus, if we properly comprehend this language, it is the position of the Board that a signed agreement is mandatory by the terms of the Statute and is not a matter regarding which the parties may negotiate. At another point in its brief its statement is, to say the least, confusing. It states: "* * * As we have seen, the reduction of agreed terms to a written signed agreement was, under the circumstances of the present case, a part of petitioner's statutory duty to bargain collectively. The Union had an absolute right to insist upon the full performance of this obligation. Petitioner could not defeat this right by offering to 'bargain' about the matter. Since a statutory obligation cannot be the subject to 'bargaining' it follows that the refusal of the S.W.O.C. to waive its statutory right cannot be said to have resulted in an 'impasse.' * * *"

This statement presents the contradictory situation by which Inland was required to "bargain collectively" but precludes it from "offering to bargain about the matter."

In its decision, however, the Board recognizes that signed agreements are not required by the Act in all instances and, that an oral agreement would not be invalid "if acceptable to both parties." It concludes that "under circumstances such as are presented here, it is the employer's obligation to accede to a request that understandings reached be embodied in a signed agreement." After holding that the question of signing is not a subject matter for negotiations, it decides: "We do not say that an oral agreement, under such circumstances, would be invalid, if acceptable to

both parties, but the difficulties inherent in an oral agreement in a situation of this sort are manifest." In other words, the Board concedes that a written agreement is not required in all cases, but holds that, "Under the circumstances such as are presented here, it is the employer's obligation to accede to a request that understandings reached be embodied in a signed agreement." Again the decision states "it seems clear to us that conformance in good faith to the procedure of collective bargaining requires a willingness to enter into a signed agreement under circumstances like these."

We are unable to agree with the argument that the Act imposes a duty upon an employer applicable only in some cases. We should think such a construction of the Statute might well endanger its validity. When the concession is made as it is, that the matter of a signed agreement is dependent upon a request by the employees or their representatives, and may be waived, we think it is clear that the matter becomes a subject of bargaining the same as any other request or demand. The Statute is barren of any express language requiring a signed agreement and it must be held that no such agreement is required unless we are authorized to read into the term "collective bargaining" the condition that all agreements, not some, must be reduced to writing.

Respondent in its brief, as well as in its decision, makes a rather forcible argument to the effect that this construction should be placed upon the Act. This argument, however, is more persuasive as to what the Board thinks the law should be, rather than what it is. Our attention is called to what is designated as the historical development of the collective bargaining process, the function of the written trade agreement as a means of insuring industrial peace, and the legislative history of the Act. On the two former propositions, the argument is predicated largely upon various economic pronouncements including the testimony of two economists of repute who testified in the hearing, one for the petitioner and the other for the respondent. We are dubious of the pertinency of the argument made in this respect. It should be directed to Congress rather than to the courts.[15a] Nor are we impressed with the argument based upon the so-called legislative history of the Act. This history rests largely upon the findings of the old Labor Board established to not enforce Section 7(a) of the National Industrial Recovery Act, 48 Stat. 195, 198. The decisions of the old Board construing that section are to the effect that an obligation was imposed upon the employer to "embody the results of collective bargaining in an agreement rather than in mere unilateral statements of policy." That proposition has little, if any, relevancy to the instant question. It would seem the legislative history of the Act could be better appraised by what was said in Congress when the Act was under consideration. Senator Walsh (Mass.) is quoted in the Congressional Record[16] on May 16, 1935, (a few days prior to the passage of the Act) as follows: "Let me say that the bill requires no employer to sign any contract, to make any agreement, to reach any understanding with any employee or group of employees."

Further, he states the situation when employer and the representatives of the employees meet for the purpose of bargaining, as follows:

" * * * What happens behind those doors is not inquired into, and the bill does not seek to inquire into it. It anticipates that the employer will deal reasonably with the employees, that he will be patient, but he is obliged to sign no agreement; he can say, 'Gentlemen, we have heard you and considered your proposals. We cannot comply with your request'; and that ends it.

"There is no effort in that respect to change the situation which exists today. All employers are left free in the future as in the past to accept whatever terms they choose."

Senator Wagner (author of the Act) is quoted as stating: " * * * The law does not require any employer to sign any agreement of any kind. Congress has no power to impose such a requirement. An agreement presupposes mutual consent. The law merely requires that an employer bargain collectively with his workers, which means that he shall receive their representatives and engage in a fair discussion, in the hope that terms may be voluntarily agreed upon by both sides without recourse to strife."

---

[15a] (National Labor Relations Board v. Falk Corp., 60 S.Ct. 307, 84 L.Ed. —, decided January 2, 1940.

[16] Vol. 79, No. 102.

The interpretation placed upon the Act by these Congressional leaders has likewise been given approval by the court in National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, where the court said: "The act does not compel agreements between employers and employees. It does not compel any agreement whatever. It does not prevent the employer 'from refusing to make a collective contract and hiring individuals on whatever terms' the employer 'may by unilateral action determine.' * * *"

The Board stresses certain language employed by the court in Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L.Ed. 126,[17] and National Labor Relations Board v. Sands Manufacturing Co., 306 U.S. 332, 342, 59 S.Ct. 508, 513, 83 L.Ed. 682.[18]

We do not think the language thus employed throws any light upon the instant question, nor is it inconsistent with what was said in the Jones and Laughlin case, supra. To us it means nothing more than that collective bargaining is compulsory under the Act. The purpose of such bargaining, of course, is to arrive at an agreement, understanding or contract. The process is mandatory—the result is not.

In arguing that we must read into the Act "signed agreements," respondent argues: " * * * Manifestly, Congress could not set out in detail every step required by the duty to bargain in good faith. Of necessity it enacted a general command and left the Board and the courts free to determine in each instance the particular implications of that command. * * *" It would be a matter of serious concern to believe that Congress legislates in any such haphazard fashion. It is fair to Congress to conclude that if it had intended to place upon the employer the duty of entering into a written agreement, it would have so provided. This belief is strengthened from the fact that in the amendments to the Merchant-Marine Act of 1936, it provided that the Board shall encourage all maritime employers and employees to exert every rea-sonable effort "to make and maintain written agreements concerning rates of pay, hours of employment, rules, and working conditions." 46 U.S.C.A. § 1254.

It is also argued that Inland's refusal to sign a written agreement was not in good faith. It would be just as reasonable to attack the good faith of the SWOC in demanding a signed agreement in view of the fact that there was no complaint and no effort to bargain with reference to wages, hours of employment and working conditions, as to attack petitioner's refusal to sign under the circumstances presented. There is no question but that the proposal to sign an agreement was given rather careful consideration. It was thoroughly discussed at a meeting of its directors, executive officers and attorneys. Some were favorable to a signed agreement, others opposed. It was finally decided to refuse. We do not think the Board or this court has any right, under such circumstances, to say that petitioner in this respect acted in bad faith in refusing to do something which the Act did not require.

Notwithstanding that the Act does not "compel any agreement whatever" the petitioner was found to have violated Section 8 (5) of the Act because of its refusal to enter into a signed agreement with SWOC, and was affirmatively directed to embody any agreement reached in a signed agreement. We do not think that the Act contemplates such a requirement and if we are right in this conclusion, it follows that the order of the Board in this respect is invalid.

In cause No. 7013, is presented a petition by Steel Workers Independent Union, Inc., (referred to as "Independent") to review the same order as that involved in the Inland case. As in that case there is no occasion for us to consider issues which arise from findings made by the Board further than we have considered such issues with reference to Inland. Independent presents a legal question which only requires brief consideration. This question arises from the Examiner's refusal (concurred in by the Board) to permit the Independent to intervene upon cer-

---

[17] "The Act contemplates the making of contracts with labor organizations. That is the manifest objective in providing for collective bargaining. * * *"

[18] "* * * The legislative history of the Act goes far to indicate that the purpose of the statute was to compel employers to bargain collectively with their employes to the end that employment contracts binding on both parties should be made. * * *"

tain of the issues tendered in the main proceeding. The Independent, in its petition for intervention, denied three important allegations of the Board's complaint, namely, that Inland had dominated and interfered with the formation and administration of the Independent; that the appropriate bargaining unit should be one other than that described in the Board's complaint and that the SWOC represented a majority of the employees in the appropriate unit.[19] At the commencement of the hearing, the Trial Examiner permitted intervention on the issue of domination in violation of Section 8 (2) of the Act. Intervention was denied on the issue of the appropriate unit and the majority claimed by the SWOC. At the close of the hearing, the Examiner changed his ruling to the extent of permitting the Independent to intervene on the question of unit with leave to introduce evidence on that issue.

Independent argues here that it was entitled to intervene on all of said issues and that the refusal of the Examiner to permit intervention upon the issue of the appropriate unit until the conclusion of the hearing, and a refusal to permit intervention on the issue of the majority of SWOC was the deprivation of a legal right.

Whatever we might think of the argument presented by Independent in this respect, we conclude the question has been decisively settled contrary to the contention of Independent. The Court in National Labor Relations Board v. Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, expressly decided that the presence of a union such as Independent was not necessary.[20]

Independent seeks to distinguish this case in that, there domination of the Independent Union was the only issue, while here we have the further issues of unit and majority, or in other words, a representation case in connection with the unfair labor practice of domination. As stated, the Examiner permitted intervention upon the latter issue which was not required under the pronouncement of the court in the Greyhound case. If, as held in that case an order may be entered against the employer ordering the disestablishment of an independent union because of employer domination without the presence of the Independent Union, we see no reason why it may not enter an order determining the appropriate unit and, that a rival organization has a majority of such unit without the presence of the employer dominated union. The order of disestablishment sounds the death knell of the Independent. Certainly the issue of its very existence is as important and even more so than that of the appropriate bargaining unit or the majority claimed by another organization.

It is argued that the order of the Board is directed at the Independent as well as Inland. We need not discuss this contention in view of the conclusion heretofore reached. An order will be entered setting aside the order of the Board in its entirety and remanding the cause to the Board for a new hearing.

---

[19] As to this issue, Independent, in its petition, did not claim a majority of the employees in the appropriate unit—in fact, at the commencement of the hearing, Independent's counsel expressly disavowed any such claim.

[20] See Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Board v. National Licorice Co., 2 Cir., 104 F. 2d 655.