ARMED FORCES COOPERATIVE
INSURING ASSOCIATION,
Appellant (Petitioner),

v.

DEPARTMENT OF INSURANCE, State
of Wyoming, Appellee (Respondent).

No. 5274.

Supreme Court of Wyoming.

Dec. 31, 1980.

Rehearing Denied Feb. 19, 1981.

**1320**

James C. Logan of James C. Logan & Associates, Kansas City, and Ward A. White of Guy, Williams, White & Argeris, Cheyenne, for appellant.

John D. Troughton, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., and Samuel A. Soule', Sr., Asst. Atty. Gen., Cheyenne, for appellee.

Arthur A. Aparicio, Jr., Lieutenant Colonel, U. S. A. F., amicus curiae, and Franklin J. Smith, Cheyenne.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and ARMSTRONG, District Judge, Retired.*

ROSE, Justice.

## PROCEDURAL BACKDROP

This is an appeal from a judgment of the district court entered January 24, 1980, affirming an order of the Insurance Commissioner entered December 27, 1976. The Commissioner's order assessed $5,000.00 and a 2½% premium tax against appellant, Armed Forces Cooperative Insuring Association (hereinafter AFCIA or the "Company" or the "Association") for 1975 and ordered it to desist from further collection of insurance premiums upon various Wyoming risks until it had obtained a certificate of authority from the Wyoming Department of Insurance.

An administrative complaint was filed against AFCIA September 15, 1976, by Merle Johnson, Assistant Insurance Commissioner, which alleged that the Company was transacting insurance business within the State of Wyoming without the benefit

---

* ROONEY, J., having recused himself from participation in this case, ARMSTRONG, D. J., Retired, was assigned, having been retained in active judicial service pursuant to Article 5, Section 5, Wyoming Constitution, and Section 5–1–106(f), W.S.1977, by order of this court entered on January 1, 1979.

of a certificate of authority, in violation of § 26–3–105[1] and § 26–32–109[2], W.S.1977, and had not paid a premium tax to the State of Wyoming on insurance written on Wyoming risks, as required by § 26–4–103, W.S.1977[3]. Service of the complaint and

1. The statute provides:

"(a) No person shall act as an insurer and no insurer shall transact insurance in this state except as authorized by a subsisting certificate of authority granted to it by the commissioner, except as to such transactions as are expressly otherwise provided in this code.

"(b) No insurer shall from offices or by personnel or facilities located in this state solicit insurance applications or otherwise transact insurance in another state or country unless it holds a subsisting certificate of authority granted to it by the commissioner authorizing it to transact the same kind or kinds of insurance in this state."

2. The statute provides:

"(a) *Issuance.*—The certificate of authority of a reciprocal insurer shall be issued to its attorney in the name of the insurer.

"(b) *Refusal, suspension, etc.*—The commissioner may refuse, suspend or revoke the certificate of authority, in addition to other grounds therefor, for failure of the attorney to comply with any provision of this code."

3. The statute provides:

"(a) *Report to commissioner.*—Each authorized insurer and each formerly authorized insurer shall file with the commissioner on or before March 1 each year a report in form as prescribed by the commissioner showing (except with respect to wet marine and transportation insurance as defined in section 26.-1–89 [§ 26–5–107]) total direct premium income including policy, membership and other fees, and all other considerations for insurance and annuity contracts, whether designated as premium or otherwise, and in whatever form received by it during the next preceding calendar year on account of policies and contracts covering property, subjects, or risks located, resident, or to be performed in this state (with proper proportionate allocation of premiums or consideration as to such persons, property, subjects, or risks in this state insured or covered under policies or contracts covering persons, property, subjects, or risks located or resident in more than one (1) state), after deducting from such total direct premium income (i) the amount of return premiums on cancelled policies (but not including the return of cash surrender values on life policies or annuity contracts), (ii) the amount returned to policyholders as current dividends, and (iii) as to domestic title insurers, that portion of the premium chargeable to title search and examination services as reasonably determined by the commissioner. For good cause shown by the insurer, the commissioner may, in his discretion, extend for not over thirty (30) days the period within which such report shall be filed.

"(b) *Computation and payment of tax.*—Coincidentally with the filing of such report each such insurer shall pay to the state treasurer through the commissioner, for the privilege of transacting business in this state, a tax upon such net premiums and net considerations, such tax to be computed thereon at the following rates:

"(i) As to foreign and alien insurers, the rate of tax shall be two and one-half percent (2½%), except as to annuity considerations, and except as provided in section 26.1–81 [§ 26–4–104];

"(ii) As to domestic insurers, the rate of tax shall be one and one-half percent (1½%) except as to annuity considerations, and except as provided in section 26.1–81 [§ 26–4–104];

"(iii) As to annuity considerations, the rate of tax shall be one percent (1%), except as provided in section 26.1–81 [§ 26–4–104].

"(c) *Tax on gross underwriting profit of wet marine and transportation insurance.*—As to wet marine and transportation insurance written in Wyoming during the preceding calendar year, on or before March 1 of each year each authorized insurer and formerly authorized insurer shall file its report with the commissioner, on forms as prescribed and furnished or accepted by him, of its gross underwriting profit on such insurance, and shall coincidentally pay to the state treasurer through the commissioner a tax of three-quarters of one percent of such gross underwriting profit. The gross underwriting profit shall be ascertained by deducting from the net premiums (i. e. gross premiums less all return premiums and premiums for reinsurance) on such wet marine and transportation insurance contracts the net losses paid (i. e. gross losses paid less salvage and recoveries on reinsurance ceded) during such calendar year under such contracts. In the case of insurers issuing participating contracts, gross underwriting profit shall not include, for computation of the tax under this subsection, the amounts refunded or paid as participating dividends by such insurers to the holders of such contracts.

"(d) *Offset for examination expenses.*—A domestic insurer may offset against taxes otherwise payable by it under this section or section 26.1–81 [§ 26–4–104], the amount

ten-day notice of the hearing was mailed to Fort Leavenworth, Kansas, where the Association has its headquarters.

At the Commissioner's request, the insurance contract of Lt. Col. Arthur J. Aparicio, Jr., Amicus Curiae, was cancelled and his full year's premium returned to him by the Association under protest and without prejudice to contest such action. There are eight other policies like the Aparicio policy presently in full force and effect in Wyoming. On October 28, 1976, AFCIA filed its Special Appearance and Motion to Dismiss on multiple grounds herein urged. The Insurance Commissioner overruled this motion, whereupon AFCIA filed its Special Appearance and Special Answer preserving all objections to *in personam* jurisdiction over AFCIA and the statutory and constitutional power of the Commissioner to conduct such hearing and to regulate and tax AFCIA and to subject it to civil penalties. The hearing resulted in an order favoring the position of the Commissioner.

AFCIA's petition for review was duly filed and the case was heard in district court at Cheyenne, Wyoming, May 8, 1978, whereupon additional testimony and exhibits were received. Lt. Col. Arthur J. Aparicio, Jr., a member of AFCIA, appeared as Amicus Curiae by consent of the court.

## FACTS

AFCIA is an unincorporated "Non-Profit Military Association" organized in 1877, with its headquarters continuously located on the United States Military Reservation at Fort Leavenworth, Kansas, where, it contends, it has its only offices, agents [4] and employees. The Association comprises some 88,000 active and retired members of the armed services.[5] On the many military reservations around the world, AFCIA is organized, authorized and designated by both the Department of the Army and Department of the Navy (including the Marine Corps) as an official "Non-Profit Military Association." It is also recognized by the Department of Defense as a "Non-Profit Military Association."

The Association is physically headquartered on property owned by the United States, and is regulated by an executive committee of five members who are senior

paid by the insurer pursuant to section 26.1–38 [26–2–122] of this code to or with respect to the commissioner or examiners representing the state of Wyoming for any examination of the insurer made after the effective date of this code.

"(e) *Tax exclusive of other state taxes; preemption of state.*—

(i) Payment by an insurer of the tax as to this section required shall be in lieu of all taxes imposed by the state upon premiums or upon income, and of franchise, privilege or other taxes measured by income of the insurer.

(ii) The state hereby preempts the field of regulating, or of imposing excise, privilege, franchise, income, license, permit, registration and similar taxes, licenses and fees upon, insurers and their general agents, agents and other representatives as such; and on the intangible property of insurers or such representatives; and all political subdivisions or agencies in the state are prohibited from regulating insurers or other general agents, agents and other representatives as such, and from imposing or levying upon them any such tax, license, or fee. Except, that this provision shall not prohibit the im-

position by political subdivisions of taxes upon real and tangible personal property of such insurers, general agents, agents and representatives.

(iii) The provisions of this subsection (d)[e] shall not be modified or repealed by any law of general application hereafter enacted unless expressly referred to or expressly repealed therein.

"(f) No tax shall be due or payable on account of premiums or considerations received from policies or contracts issued in connection with a pension annuity or profit-sharing plan exempt or qualified under sections 401, 403, 404, 408 or 501 of the United States Internal Revenue Code of 1954, as amended or renumbered from time to time, with respect to the tax payable in 1968 or thereafter."

4. AFCIA has no paid insurance agents anywhere.

5. All members are insured worldwide at the same rates for personal property and public liability.

officers on active duty at Fort Leavenworth. Although elected by the membership, these officers must obtain written approval of their Commanding General at Fort Leavenworth and they serve on the executive committee at his pleasure. The Association neither has nor maintains any office or paid employee or representative outside the boundaries of the Fort Leavenworth military reservation and has no office, property, employee, representative, agent, telephone, post office box or address within the State of Wyoming or within the state civil-court jurisdictions and boundaries of any other state.

AFCIA always has and does now operate as an unincorporated association, whose members are limited to the Armed Forces of the United States of America. The membership is further limited to warrant officers and commissioned officers for whom casualty insurance coverage is available. This last-mentioned insurance is available to military personnel in the three highest enlisted grades, who, however, are not eligible for membership in the Association. Applications for membership and applications for insurance are made to AFCIA at Fort Leavenworth by mail, telephone, or personal visit, and require approval at a meeting of the executive committee. AFCIA is not authorized to, nor has it issued, any capital stock.

No salesmen or agents are employed by AFCIA and no commissions are paid by it to anyone. All insurance contracts of the Association are prepared at Fort Leavenworth, some of which are mailed to policyholders in the State of Wyoming, and some premium payments therefor are mailed from Wyoming to the home office of AFCIA at Fort Leavenworth, and are acted upon there. All claims which may be allowed Wyoming insureds are paid by AFCIA to the accounts of the claimants at the Army National Bank (unaffiliated with AFCIA), Fort Leavenworth, Kansas, subject to withdrawal according to the pleasure and direction of the respective claimants.

Most claims are paid solely on the word of the insured, but a claimant who resides in Wyoming may designate an advisory board of not more than three members of AFCIA, who serve without remuneration, or other persons eligible for membership, to examine the attendant circumstances and assess the loss claimed. If such persons are not available, however, the claimant may obtain a statement from the officials of the local fire department, other local officials and/or other disinterested witnesses, none of whom receive pay for their services. The claimant has the option of selecting and obtaining the services of a professional adjuster if he deems this necessary to the formulation and preparation of his or her claim. All claims are reviewed and decided upon by the staff and Executive Committee of AFCIA at Fort Leavenworth.

AFCIA is not presently transacting new business with respect to residents and risks located in Wyoming, but it does continue collection of premiums on and the servicing of such Wyoming policies as remain in force at this time.

There are presently 99 AFCIA policies in force in Wyoming, 84 of which had been issued by AFCIA before the insureds moved here. Three of the individuals who had not been insured by AFCIA before moving to Wyoming reside on the Warren Air Force Base. Total premiums received by AFCIA on 1976 coverage from the aforesaid 84 persons is $9,144.16, and from the aforesaid remaining 15 persons is $1,861.54.

The Association does not now have, nor has it ever had, a Certificate of Authority to do insurance business in this state, and one has never been applied for.

AFCIA has never filed an annual report or paid an annual premium tax, but is willing to file its annual report voluntarily with the Wyoming Department of Insurance if so requested.

The Association has issued casualty and property insurance covering personal property situated inside the boundaries of feder-

al military reservations, and has issued casualty and property insurance on both personal and real property outside the confines of military reservations within the boundaries of the State of Wyoming.

## ISSUES

The appellant calls attention to the following issues for review:

"I. The 'confidential' actions, pre-hearing procedures taken by the Commissioner of Insurance acting in his dual capacity of Complainant by directions to his subordinates and at the same time as an Administrative Judge contravene AFCIA's basic rights and due process of law under the Federal and State Constitutions and Statutes, particularly Article I of the Wyoming Constitution and Article I and Amendment XIV of the United States Constitution, denying AFCIA an impartial hearing.

"II. The Wyoming Insurance Code is completely inapplicable to AFCIA because AFCIA is prevented by the Kansas Cession Act from complying with the Commissioner's order of December 27, 1976, to which Wyoming is required to give full faith and credit.

"III. The Federal Government has exclusive jurisdiction over AFCIA and has preempted the functions of control, regulation and taxation. The State of Wyoming is required to accord the Kansas Cession Act and arrangements with the Federal Government full faith and credit. Wyoming is required to recognize the supremacy of Federal Law including administrative decisions and arrangements made with the Department of the Army for AFCIA to be organized and to issue at Fort Leavenworth insurance coverage to military personnel located worldwide. Wyoming may not interfere with regulation of AFCIA by senior officers of the United States on active duty.

"IV. AFCIA is immune from tax, regulation and control by the Commissioner of Insurance because it is recognized by the United States as an official Non-Profit Military Association and is a Federal instrumentality.

"V. The Commissioner's attempt to regulate AFCIA, a Mail Order Insurer, to require it to obtain a Certificate of Authority, to pay fees and premium tax and to penalize appellant $5,000 violates rights of due process guaranteed by the constitutions of the United States and Wyoming.

"VI. The Commissioner acquired no personal jurisdiction over AFCIA by which to hold a purported hearing and enter a binding order subjecting AFCIA to regulation, payment of premium taxes and levying a $5,000 civil penalty. The order of December 27, 1976, is therefore a nullity for violation of due process. Purported service of process should be quashed and the case dismissed ab initio.

"VII. Failure of the Wyoming Insurance Code to apportion the gross premiums tax between in-state and out-of-state activities violates rights of due process and equal protection and renders the imposition of tax and regulation unconstitutional if applied to Appellant. Failure of the Commissioner to rule on this vital point deprived AFCIA of a full hearing and renders the administrative proceeding and order a nullity.

"VIII. Cancellation of Aparacio's coverage instanter without a hearing and prospective cancellation of the now remaining memberships and their coverage constitute impairment of contractual rights, wrongful predecision of the case before hearing, denial of due process and equal protection; furthermore, failure of the Commissioner to consider and rule on this basic point raised before him renders his order of December 27, 1976, a nullity.

"IX. AFCIA is exempted from any requirement of a certificate of authority by W.S. 26–3–106.

"X. The Commissioner's Decision and Actions herein disregard the rights of AFCIA's members as consumers and fail

to follow the spirit of most recently developing law of Consumer Protection."

## ISSUE NO. I

The appellant alleges that it did not receive a fair hearing. We spoke of fair-hearing requirements in *Fallon v. Wyoming State Board of Medical Examiners,* Wyo., 441 P.2d 322, 327 (1968), where we said:

> "With respect to a fair hearing, it is fundamental that principles of justice and fair play require 'an orderly proceeding appropriate to the case or adapted to its nature, just to the parties affected, and adapted to the ends to be attained, one in which a person has an opportunity to be heard, and to defend, enforce, and protect his rights before a competent and impartial tribunal legally constituted to determine the right involved; representation by counsel; [and] procedure at the hearing consistent with the essentials of a fair trial according to established rules which do not violate fundamental rights.' 2 Am.Jur.2d, Administrative Law, § 353, pp. 166–167."

We re-acknowledge and remain ever mindful of that doctrine throughout this opinion.

## ALLEGED PREHEARING ERRORS

### (a) *Denial of motion for continuance.*

■ AFCIA contends, even though otherwise competently represented, that it was error for the Commissioner to fail to grant its motion for continuance of the administrative hearing because one of its attorneys was ill. Under § 1–9–102, W.S.1977, the court "may continue any action at any stage of the proceedings...."

The granting or refusing of a request for continuance is "ordinarily a matter within the sound discretion of the trial court under the circumstances of each case." *Glover v. Berger,* 72 Wyo. 221, 263 P.2d 498, 507 (1953). Courts have enunciated rules for continuances in varying circumstances.

Where one of the party's attorneys was absent for illness, and he was also represented by other counsel, it was not improper to deny a motion for a continuance. *Commercial Lumber Co. v. Ukiah Lumber Mills,* 94 Cal.App.2d 215, 210 P.2d 276 (1949). The *Commercial Lumber* court said that the "plaintiff was in nowise prejudiced by not having been granted the continuance requested and there was no abuse of discretion upon the part of the trial court in refusing to grant a new trial upon that ground." *Commercial Lumber Co.,* supra, 210 P.2d at 279. Other jurisdictions have followed suit. *Whitley v. Clegg,* 120 Ga. 1038, 48 S.E. 406 (1904); *American Rubber Corp. v. Jolley,* 260 Ala. 600, 72 So.2d 102 (1954); *C. H. Robinson Co. v. Hudgins Produce Co.,* 138 Ark. 500, 212 S.W. 305 (1919); and Annotation: 67 A.L.R.2d, Continuances—Illness of Counsel, 497, 510.

The record in the administrative hearing reveals that the hospitalized attorney's co-counsel did a credible job in handling the issues and the witnesses involved.

### (b) *Allegation that the Hearing was Inherently Biased.*

■ The appellant argues that it was improper for Commissioner Langdon to be both the complainant and the judge in the Insurance Department against the appellant. Our perusal of the record indicates that Assistant Commissioner Merle Johnson, not Commissioner Langdon, was the complainant. But even if we do not distinguish between the Commissioner and his assistant in this context, we are unpersuaded that appellant should prevail.

It cannot be assumed that the Commissioner is biased simply because he sits as the hearing authority in a case brought by the agency. We said in *Fallon,* supra, 441 P.2d at 329:

> "We also start, of course, with the presumption that members of the board 'are assumed to be men of conscience and intellectual discipline, capable of judging

a particular controversy fairly on the basis of its own circumstances,' *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 1004, 85 L.Ed. 1429. See also *National Labor Relations Board v. Donnelly Garment Co.*, 330 U.S. 219, 67 S.Ct. 756, 91 L.Ed. 854. . . . "

See, also, *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

This court is not, however, unaware of the problem of which appellant complains—and we have addressed it before. See, *Board of Trustees, Laramie County School District No. 1 v. Spiegel*, Wyo., 549 P.2d 1161 (1976). In *Spiegel*, supra, we said that an unbiased hearing is a constitutional necessity. *Sorin v. Board of Education*, 39 Ohio Misc. 108, 315 N.E.2d 848, 851 (1974). We affirmed the right to a fair hearing in *Fallon*, supra; and in *Spiegel*, supra, we cited a concurring opinion from *Fallon* where it was said:

> " 'In the *Steward* [*Board of Medical Examiners v. Steward*, 203 Md. 574, 102 A.2d 248] and *Nemitz* [*New Jersey State Board of Optometrists v. Nemitz*, 21 N.J. Super. 18, 90 A.2d 740] cases cited . . . recognition was given to the fact that the due process clause of constitutions guaranteeing to every person a fair hearing before a fair and impartial court applies to administrative agencies exercising judicial or quasi-judicial functions. . . .' " 549 P.2d at 1166.

In *Spiegel*, the point was concluded with this observation:

> "We have, therefore, formerly held, and I would here reaffirm, that embraced by the appellee's constitutional and statutory guarantee to a fair hearing in the administrative process, is his right to be heard before an unbiased, fair and impartial tribunal—one which is
>
> " 'free from bias and prejudice and imbued with the desire to accord to the parties equal consideration. . . .' *Inland Steel Co. v. National Labor Relations Board*, 7 Cir., 1940, 109 F.2d 9, 20." 549 P.2d at 1166.

■ It is, of course, the appellant's burden to prove impropriety on the part of the Commissioner. *Forest Oil Corporation v. Davis*, Wyo., 396 P.2d 832, 836 (1964); and *Spiegel* supra.

We have examined the record and cannot come to the conclusion that appellant would have us reach. We would, however, remind hearing officers everywhere, as they perform their duties throughout Wyoming, that, in view of the character of the entire administrative procedure process, where there are no independent hearing officers available, the hearing officer is in a tenuous and hugely volatile position. In such circumstances, it may seem to contestants that the hearing officer is playing inherently inconsistent roles, inasmuch as it is he or she who authorizes the complaint—and whose lot it is to oversee the investigation and preparation of the case and who also sits in judgment of the respondent. This calls for all hearing officers to not only *be* fair and impartial but to also *act* as judicially unbiased as is humanly possible so that not only will the right to a fair hearing be preserved, but the *impression* of a fair hearing will be vividly conveyed.

(c) *Preparation by the Department's Staff and Assistant Attorney General.*

The gist of this allegation is that the Department staff: (1) interviewed witnesses in preparation for the hearing and then discarded some; and (2) failed to disclose the existence of the NAIC Examiner's Handbook.

■ The appellant presents no cogent argument in support of these points and—for the most part no authority. We do not, therefore, need to consider them. *Merritt v. McIntyre and McIntyre Garden Center*, Wyo., 613 P.2d 206, 208 (1980); *Scherling v. Kilgore*, Wyo., 599 P.2d 1352, 1359 (1979); and *Peterson v. First National Bank of Lander*, Wyo., 579 P.2d 1038, 1040 (1978). In any event, there is no prejudice shown. *Pure Gas & Chemical Company v. Cook,*

Wyo., 526 P.2d 986, 992 (1974); *Robertson v. State Highway Commission*, Wyo., 450 P.2d 1003, 1005 (1969); *Waters v. Trenckmann*, Wyo., 503 P.2d 1187, 1192 (1972); and *Booth v. Hackney*, Wyo., 516 P.2d 180, 183 (1973).

#### (d) *Alleged use of Subpoena Power.*

AFCIA contends that the Commissioner allowed Assistant Commissioner Johnson to procure a copy of an AFCIA insurance policy issued to Lt. Col. Arthur Aparicio, and this violated Aparicio's rights. AFCIA says that *ex parte* subpoenas are not allowed in connection with investigations unknown to the accused and are in contravention of rights of privacy.

Section 26–2–123(a), W.S.1977, empowers the Commissioner to

"... administer oaths and affirmations, examine and cross-examine witnesses, receive oral and documentary evidence, subpoena witnesses, compel their attendance and testimony, and require by subpoena the production of books, papers, records, files, correspondence, documents and other evidence which he deems relevant to the inquiry."

AFCIA's argument does not take into account situations where the Department suspects a violation. The Department would not be able to proceed in an investigation absent authority to subpoena records of the suspect insurer. The appellee contends (and we agree) that there is a "duality" of subpoena power. During the investigative stage, the Department, through the Commissioner, may exercise subpoena powers *ex parte* to determine whether or not a complaint should be issued. When it has been decided that a complaint should issue, the investigative stage moves into the contested aspect of the proceeding, where the authority to subpoena stems from the Administrative Procedure Act.

#### (e) *Requiring AFCIA's Brief to be Filed on Sunday.*

AFCIA contends that the fact that the Commissioner required briefs to be filed on Sunday, November 14, 1976, was arbitrary and capricious. The commissioner explains that when the filing date was set, he was unaware it was Sunday. Appellant cites no authority which holds that the Commissioner is guilty of an arbitrary and capricious act and does not indicate that it has been prejudiced in any way. We will not consider the point in view of these shortcomings. *Merritt*; *Scherling*; *Peterson*; *Pure Gas & Chemical Company*; *Robertson*; *Waters*; and *Booth*; supra.

#### (f) *The Transmittal of an AFCIA Policy by an Insurance Agent to the Department.*

Appellant argues:

"The record indicates that Assistant Commissioner Johnson received a copy of Lt. Col. McDonald's AFCIA policy from his agent in Worland, Wyoming, and when AFCIA's counsel, Miss Guy, learned of this and also learned of Col. McDonald's inability to come to Cheyenne and testify at the hearing, she sought to take his deposition so as to inquire into those circumstances and this request was refused by the Commissioner ... Refusal to allow this deposition of a potential witness is relevant to the issue of fairness and impartiality of the administrative judge."

This is the whole of appellant's comment on this point. We will not consider this argument for the same reasons we would not consider the points sought to be made under sub. (c) and (e), supra.

We might say that these shotgun-type briefs, which cite no authority for the position taken, leave much to be desired so far as this court is concerned. We are not the lawyers for the litigants. If the paid attorneys want this court's consideration, they will have to brief and cite authority for the points which they feel deserve our attention—otherwise they will receive no notice whatever.

#### (g) *It is Charged that Commissioner Langdon Predetermined the Issue Prior to Hearing.*

In support of this contention, the appellant cites a statement attributed to

the Commissioner by appellant's counsel. Assistant Commissioner Merle Johnson testified that the following was the substance of a statement made by the Commissioner before the hearing:

> "... just as maybe he or others may have exceeded the speed limit while on the highway and violated the law, so that respondent has violated the law in connection with this, the issuance of insurance policies to persons residing in Wyoming; ..."

It is also asserted that the fair-hearing rights of the Insurance Company were jeopardized because the deputy commissioner had decided, more than two months before the hearing, that the appellant was guilty of the charged violation. It is admitted that this conclusion was relayed to the Commissioner; and it is also undisputed that the deputy commissioner had various but unidentified conversations with the Commissioner before the hearing.

In relation to the communications between the Assistant Commissioner and Commissioner Langdon before the hearing, the Amicus Curiae quotes the following from *Fallon*, supra, 441 P.2d at 329:

> "... Despite the good intentions of the members of the board to disregard the report and what the committee did, our responsibilities are clear and we think we cannot under the circumstances carry the presumptions favoring the board to the extent of holding that the members of the board could efface from their minds the improper and inflammatory extraneous matters presented to them ex parte prior to the hearing as trained, knowledgeable, and experienced finders of fact might do, and thus impartially weigh the evidence adduced at the hearing...."

The circumstances which evoked this comment from the court in *Fallon*, supra, are contained in the following from the opinion:

> "There was filed instead [of a complaint] a copy of an unsworn written report which the grievance committee had previously made to the state medical society. Although that report was replete with hearsay, speculation and conjecture, we do not pass on the question of whether or not the committee properly discharged its function so far as the state medical society was concerned. What seems to have been overlooked, however, is that such committee had no legal standing so far as the board was concerned and was performing no authorized function for the board.

> "Notwithstanding, *it is conceded that the board on its own initiative proceeded to review this non-juridical report relating to some eighteen patients and selected therefrom the four cases named above which were regarded by the board as 'typical' of the complainants' accusations.* It is asserted by the licensee and borne out by the record that this was done in order to complete the hearing in one day. The selected cases, by the way, were cases wherein the X-ray reports—not the X-ray films—purportedly revealed a discrepancy between the claim for payment made to Blue Shield and the medical services rendered to the named patients by the licensee. While it is suggested by the board that the notice of hearing did not confine the statutory charge to those cases, we think any reasonable interpretation of the notice is to the contrary.

> "As to the matter stood up to the time of the hearing, the report of the committee and the so-called bill of particulars contained information most damaging to the licensee concerning some fifteen patients and other information extraneous to the matters to be heard. Perhaps the most prejudicial matter in the entire report was the recital of the conclusion which that committee drew from the contents of the report and submitted ex parte to the board that licensee was guilty of using false and fraudulent statements in his practice. The report also made clear that the conclusion to a large extent was predicated upon licen-

see's failure to appear before the committee at the time requested, which also was wholly improper, *Harris v. State*, 23 Wyo. 487, 153 P. 881, 888, particularly when it is considered that there was no duty upon the licensee to appear so far as the board was concerned. Besides neither the committee nor the board was entitled as a matter of right to the private records of licensee described in their notices. *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574. The harmful effect of the report was compounded when the evening before the hearing the board again reviewed all of the information that had been submitted by the complainants and sent word to counsel for the parties that it was still satisfied that 'an adequate investigation of these problems' could be had by limiting the hearing to the four patients named in the notice of the board.

"Our responsibilities bearing upon the contention of bias and prejudice on the part of the members of the board are well stated in *State ex rel. Beddall v. Lonctot*, 62 Wash.2d 845, 384 P.2d 877, 883–884, 97 A.L.R. 1201:

"' * * * In our highly complex society, the usefulness of these [administrative] agencies is apparent. Their use and importance emphasizes the necessity for their operation in a manner which will leave unblemished the faith of the American people in their government. These considerations make apt the following quotation from *Inland Steel Co. v. National Labor Relation Board*, 7 Cir., 109 F.2d 9, (1940), where the court said:

"' "The Act authorizes the Board to enter an order upon a complaint alleging unfair labor practices, only after a 'hearing.' This must mean a trial by a tribunal free from bias and prejudice and imbued with the desire to accord to the parties equal consideration. There is perhaps no more important right to which litigants are entitled than that

they be given such a trial. Its impairment, ipso facto, brings the court, and administrative bodies as well, into public disrepute, and destroys the esteem and confidence which they have enjoyed so generally. Time and experience have demonstrated that the public, as well as litigants, will tolerate the honest mistakes of those who pass judgment, but not the biased acts of those who would deprive litigants of a fair and impartial trial. Foremost among the responsibilities imposed upon a reviewing court, is to make sure that this foundation of our judicial system be not undermined." 109 F.2d, p. 20.' " 441 P.2d at 328–329.

In the instant case, our review of the record indicates that the Commissioner, in response to questions about his bias, stated that, yes, he did know how his staff felt about the issues of this case, because otherwise he wouldn't be holding a hearing. In other words, there would be no hearing if the Insurance Department staff felt it did not have a case against the appellant. We discussed, supra, the proposition which holds that merely because an individual plays both an investigative, as well as an adjudicative role, it does not necessarily follow that due process has been denied. In our judgment, the above comment of the Commissioner is not a demonstration of bias which amounts to a denial of due process. When the issue of the extent of Commissioner Langdon's bias was raised, the Commissioner offered to make himself available for voir dire, a procedure we discussed in *Spiegel*, supra. This offer was not accepted and we do not think the record establishes sufficient contact or collaboration between the Commissioner and his staff to hold that appellant was denied a fair hearing.

■ The statement allegedly made by the Commissioner to Assistant Commissioner Johnson, to the effect that the Commissioner had determined in advance of the hearing that appellant was guilty, was denied by the Commissioner in that he stated

at the hearing that he had not made up his mind yet. The absence of the voir dire of the Commissioner makes it difficult for a reviewing court to test the Commissioner's denial that he prejudged the case against his assistant's general affirmance of an alleged statement. As said in *Spiegel*, supra, 549 P.2d at 1169:

> "There are other reasons for allowing voir dire inquiry—as was said in *Federal Home Loan Bank Board [v. Long Beach Federal Sav. and Loan Ass'n]* [9 Cir., 295 F.2d 403, 408 (1961)]*, supra:
>
> > " '... Evidence of bias or prejudice on the part of Board members would also be relevant for consideration by a court called upon to review a final Board order. [Citation]' "

In addition, we note that this case has turned on vigorously contested legal issues, but there appear to be no factual disputes, save the issue of the Commissioner's state of mind prior to the hearing. Any legal error that the Commissioner may have made—for whatever reason—was subject to correction in the district court and in this court. Having reviewed the record, and since we uphold the Commissioner's legal conclusions based upon our own independent review of the law, we hold that the appellant has not demonstrated prejudice constituting error.

**(h)** *The Cancellation of Aparicio's Policy.*

■ There is no authority cited for the proposition that it was evidence of bias and prejudice for the Commissioner to cancel the Aparicio policy without a hearing. Here is what the Amicus Curiae brief says about this point:

> "*Your Amicus' Policy of Insurance With AFCIA Was Cancelled At The Request Of Commissioner Langdon's Subordinates Prior To The Hearing But No Such Request Was Made Relating To The Other Wyoming Policy Holders.*
>
> "Your amicus' policy with appellant was reluctantly forfeited by AFCIA upon

demand of the Department of Insurance several weeks before the administrative hearing on November 18, 1976 ... No such demand was made with relation to the other Wyoming AFCIA policy holders but for some reason your amicus was singled out by the Commissioner. Your amicus believes such action violated his rights to fairness and due process, equal protection and impairment of his rights to contract as guaranteed by Art. 1, Sec. 35 and Sec. 6 of the Wyoming Constitution...."

Appellant does not even attempt to brief this point. This does not constitute the briefing requirement by the Wyoming Rules of Appellate Procedure. Rule 5.01—Brief of the appellant—provides:

> "The brief of the appellant shall contain under appropriate headings and in the order here indicated:
>
> \* \* \* \* \* \*
>
> "(4) An argument. The argument may be preceded by a summary. The argument shall contain the contentions of the appellant with respect to the issues presented, the reasons therefor, *with citations to the authorities*, statutes and parts of the record relied on;" (Emphasis supplied.)

Neither the Amicus Curiae nor the appellant have complied with Rule 5.01(4), W.R. A.P. We will not consider the point. *Merritt; Scherling; and Peterson, supra.*

**(i)** *Nonsubmission of a Brief by the Attorney General.*

■ Appellant's sole argument on this point is: "The nonsubmission of any brief by the Attorney General's staff indicates he regarded no need for briefing the predecided case." Apparently, the State relied on oral argument, as evidenced by the transcript, to present its case to the Commission. This hardly proves bias on the part of the Commissioner. Since there is no authority cited, we will not consider the point anyway.

## HEARING ERRORS

(a) *Appellants Argue that it was Error for the Commissioner to rule that all Prehearing Investigations were confidential.*

In the agency hearing, the respondent sought to cross-examine a complainant witness on matters having to do with the investigation undertaken by the Department in its preparation of its case against AFCIA. The witness was asked a question—the Department's attorney objected—the Commissioner ruled that the question did not have to be answered because it pertained to the investigatory aspect of the case, which he perceived to be protected under the Administrative Procedure Act, §§ 9–4–101 to 9–4–115, W.S.1977. In an effort to be absolutely sure of himself, the Commissioner then called a recess and invited the respondent to make an offer of proof, which the attorney for AFCIA declined to do.

Out of this, appellant charges that the Commissioner's ruling indicated bias on his part and asserts that the inquiry of the witness into the investigatory aspects of the case was being offered to prove this bias on the part of the Commissioner.

Here is the authority which AFCIA submits to establish its point:

"What better way is there to determine possible bias or predetermination of a case than to inquire into investigative procedures. *In the Matter of State Bank Application of Security Bank, Buffalo, Wyo., Wyo. Bank & Trust Co. of Buffalo, Wyo. v. Dwight D. Bonham, St. Bank Examiner, State of Wyoming. Security Bank of Buffalo, Wyo.* Supreme Court of Wyoming, October Term A.D.1979, No. 5153 dealt with investigative procedures of an administrative agency without notice to the parties. Although the agency's actions were sustained on the basis of actual knowledge of the parties as to the agency's actions, Judge McClintock's dissenting remarks in the advance opinion are particularly appropriate and analagous to the instant case: 606 P.2d 296 (1980)

"'Without attempting a lengthy analysis of the objections to permitting an administrative agency to act upon its own information, not disclosed to the contesting parties, it is my conclusion that federal and state administrative procedure acts uniformly condemn such acts.' 606 P.2d at 304."

We do not consider the above-cited case to be authority for the proposition urged by the appellant in this appeal by any stretch of the imagination. The issue in the bank case was whether or not the bank examiner, in conducting his own investigation into a new bank application, erred in not disclosing the results of the inquiry to the protestants so that they could meet and controvert the newly acquired facts if they chose. There is not a word in either the majority or dissenting opinions about obtaining the evidence in order to show the examiner's bias—the reason given for the objection to the Commissioner's refusal to hear the investigatory testimony in this case.

All this being so, we again conclude that appellant has furnished us with no relevant authority for this point and no cogent argument in its behalf. We decline to further consider it. *Merritt; Scherling;* and *Peterson, supra.*

(b) *It is Charged that the Commissioner's Staff Withheld Evidence.*

There is no cogent argument made, nor does the appellant cite authority, for this allegation. We will, therefore, not consider it. *Merritt; Scherling;* and *Peterson,* supra.

(c) *It is Alleged that the Commissioner did not Rule on Certain Aspects of the Case, i. e., the Constitutionality of the Premium-tax Statute.*

In his Findings of Fact, Conclusions of Law, Decision, and Order, the Commission-

er said: "... [I]t seems to me that this is a question which would be more appropriately raised on appeal before a court of law." *Belco Petroleum Corp. v. State Board of Equalization*, Wyo., 587 P.2d 204 (1978), held that administrative agencies have no authority to determine the constitutionality of a statute. In *Belco*, where the State Board of Equalization declined to decide the constitutionality of the tax law as it was applied by the Department of Revenue and Taxation, we said:

"... We hold that an administrative agency has no authority to determine the constitutionality of a statute [Citations]. This is so whether the question is the constitutionality of the statute *per se* or the constitutionality of the statute as applied...." 587 P.2d 214.

We discuss the constitutionality of the premium tax, infra.

(d) AFCIA alleges: The $5,000.00 civil penalty imposed upon appellant by the Commissioner is excessive and shows bias and prejudice. No authority is cited for this proposition and we will not consider it. *Merritt; Scherling;* and *Peterson*, supra.

(e) *Allegation of an Erroneous Finding by the Commissioner.*

To prove bias, the appellant argues: "The Commissioner erroneously found that the advertisement contained, 'an application for insurance,' when in fact it contained merely a brief questionnaire of interest." Regardless of whether or not the Commissioner made the technical error complained of, such error, if indeed it exists, hardly proves bias. In any case, no authority is cited and the point cannot, therefore, be seriously considered—if at all—according to authority above cited.

(f) *An Objection by Commissioner Langdon.*

Appellant argues that at one point in the hearing before Commissioner Langdon, the Commissioner objected to a question, thus revealing his bias because he was, thereby, assuming the role of an advocate. The exchange to which appellant objects is:

"Q. In your opinion, is Commissioner Langdon basically an honest person?

"COMMISSIONER LANGDON: I object to that myself.

"MR. LOGAN: I object to that question. No question has been raised about anyone's honesty. However, a very serious question has been raised about the procedure that has been followed, whether it accords the Respondent its constitutional rights.

"MR. HANSCUM: I will withdraw the question."

The objected-to question was asked by the State's counsel; appellant's own counsel joined Commissioner Langdon's objection to the question. Commissioner Langdon's objection to a question, which appellant's own counsel agreed was irrelevant, does not indicate bias on the part of Commissioner Langdon.

ISSUE NO. II

Appellant alleges that it is impossible for it to comply with the requirements of the Wyoming Insurance Laws and, therefore, the holding of the Commissioner and the judgment of the court have the effect of depriving it of due process of law. Appellant argues that this is so because it is not subject to regulation either by the state within whose boundaries it is domiciled or by the Federal Government. Whether or not appellant has accurately interpreted the legal situation is irrelevant. Our legislature has the power to regulate insurance activity within the state and to impose requirements on insurance companies which wish to transact business in the state. Appellant has not presented any cogent argument or authority for the proposition that it is not subject to Wyoming law just because another state has held the appellant *not* to be subject to *its* law or because the Company is not subject to Federal regulation. We

need not consider the point further. E. g., *Merritt; Scherling*; and *Peterson*, supra.

## ISSUE NO. III

 This issue is actually a medley of five arguments to the effect that federal jurisdiction of appellant is exclusive. We will consider them serially:

"A. AFCIA's sole facility and operation is at the federal enclave of Fort Leavenworth as an official non-profit military association under sole regulatory and tax jurisdiction of the United States."

This argument is, in turn, broken into three sub-arguments:

"1. The Kansas Cession Act of 1875 transferred exclusive jurisdiction to the United States.

"2. Immunization from state regulation and taxation stems from location on the enclave.

"3. Effects of enclave activity on the state do not impair immunity from state control and taxation."

These three arguments are largely repetitive of Issues Nos. IV, V and VI, infra. In our discussion of Issue No. IV, infra, we hold that appellant is not a federal instrumentality; thus, in seeking to regulate appellant, Wyoming is not attempting to regulate the federal government. In our discussion of Issues Nos. V and VI, we hold that appellant has sufficient contacts with Wyoming to justify Wyoming's assertion of *in personam* jurisdiction over the appellant. We also discuss at length appellant's contention that its relationship to Wyoming is so tenuous that Wyoming is not justified in asserting taxing and regulatory authority over it. We conclude that under the controlling federal law, appellant has submitted itself to Wyoming's taxing and regulatory authority, despite its minimal presence in Wyoming.

 The answer to appellant's argument No. III A. is that Wyoming is not attempting to regulate or tax property or activity beyond its borders; rather, Wyoming is taxing and regulating appellant's activity within the State of Wyoming. Admittedly, when considering an interstate contract, it is often a fine question as to where the contract activity transpires. However, this topic is dealt with exhaustively in our discussion of Issues Nos. V and VI.

"B. The Federal Government is already regulating all activities of Appellant."

Appellant argues that such federal regulation as presently exists, e. g., army officers involved in running AFCIA and submission to FTC mail order regulations, preempts state regulation. Its only authority for the preemption claim is a rehash of the enclave argument. Appellant also argues that it is in excellent financial health and has been so certified by an insurance rating organization. That sort of plea for exemption from state regulation is more appropriately made to the Wyoming Legislature or to Congress; it is not a cogent argument before the Wyoming Insurance Department.

"C. Taxation and regulation to which AFCIA would be subjected by the Wyoming Insurance Department comprise minute supervision of all AFCIA's departments, activities and executive committee of senior military officers at Fort Leavenworth and constitute unlawful interference with supervision and regulation by senior military officers of the United States and the conduct of activities of AFCIA authorized by the United States at the federal enclave within its sole jurisdiction, all in contravention of the full faith and credit clause (Art. IV, Sec. 1), the Supremacy Clause (Art. VI, Cl. 2) and the Federal Powers Clause (Art. IV, Sec. 3, Cl. 2) and the Federal Enclave Clause (Art. 1, Sec. 8, Cl. 17) of the United States Constitution."

We dismiss this claim with reference to our holding in the discussion of Issue No. IV that appellant is not a federal instrumentality.

"D. The McCarran-Ferguson Act grants no authority to the State of Wyoming to tax and regulate insurance activities at Fort Leavenworth insuring risks located in Wyoming."

This argument is discussed in exhaustive detail in our discussion of Issues V and VI.

"E. Inaction of the State of Wyoming since achieving statehood in 1890 constitutes cogent support for inapplicability of Wyoming insurance statutes to AFCIA."

This argument appears to be that the Insurance Department's prior inaction is an agency determination that it lacked jurisdiction over appellant and that the Department's own interpretations of its governing statutes are entitled to weight. However, this argument is made in the context of the issue of whether controlling federal law prevents the Department's exercise of jurisdiction. There is no purpose to be gained in deferring to implied past interpretation of federal law by a state agency. We have, instead, chosen to look to the controlling United States Supreme Court cases, analyzed in our discussions of Issues IV, V and VI.

## ISSUE NO. IV

Appellant alleges that it is a federal instrumentality and as such is immune from state taxation and regulation. The gist of this argument is that its mission is to provide low-cost insurance to military personnel and thereby contribute in a small way toward making military service financially attractive, thus helping Congress in its constitutionally authorized goal of providing "for the common Defense." Article I, Section 8, United States Constitution.

While AFCIA cannot rely for its existence upon statutory authority, it argues that it is a federal instrumentality because it receives an effective subsidy from the military base at Fort Leavenworth in the form of token rent for its headquarters. Moreover, it points out that it is governed by army officers on active duty at Fort Leavenworth.

■ A congressionally authorized federal entity is exempt from state taxation. Chief Justice Marshall, speaking for a unanimous court, said in 1819:

"The sovereignty of a State extends to every thing which exists by its own authority, or is introduced by its permission; but does it extend to those means which are employed by congress to carry into execution powers conferred on that body by the people of the United States? We think it demonstrable that it does not...." *M'Culloch v. State of Maryland*, 17 U.S. (4 Wheat.) 316, 429, 4 L.Ed. 579 (1819).

■ It is also true that a federal instrumentality such as the Post Office, is exempt not only from state taxation but also from state regulation, e. g., *Johnson v. Maryland*, 254 U.S. 51, 41 S.Ct. 16, 65 L.Ed. 126 (1920), in which it was held that Post Office drivers need not obtain a Maryland driver's license to drive Post Office vehicles in that state. In that case, the Court framed the issue as "whether the State can interrupt the acts of the general government itself." *Johnson*, supra, 254 U.S. at 55, 41 S.Ct. at 16.

■ However, appellee maintains that appellant is not a federal instrumentality. Appellant relies on *Department of Employment v. United States*, 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966), a case which determined that the Red Cross is a federal instrumentality and therefore immune from an employment compensation tax sought to be imposed by Colorado. The Court said:

" ... Although there is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality, the Red Cross is clearly such an instrumentality ... Congress chartered the present Red Cross in 1905, subjecting it to governmental supervision and to a regular financial audit by the Defense, then War, Department ... Its principal

officer is appointed by the President, who also appoints seven (all governmental officers) of the remaining 49 Governors . . . By statute and executive Order there devolved upon the Red Cross the right and the obligation to meet this Nation's commitments under various Geneva Conventions, to perform a wide variety of functions indispensable to the workings of our Armed Forces around the globe, and to assist the Federal Government in providing disaster assistance to the States in time of need. Although its operations are financed primarily from voluntary private contributions, the Red Cross does receive substantial assistance from the Federal Government. And time and time again, both the President and the Congress have recognized and acted in reliance upon the Red Cross' status virtually as an arm of the Government. In those respects in which the Red Cross differs from the usual government agency—e. g., in that its employees are not employees of the United States, and that government officials do not direct its everyday affairs—the Red Cross is like other institutions—e. g., national banks—whose status as tax-immune instrumentalities of the United States is beyond dispute." 385 U.S. at 358–360, 87 S.Ct. at 466–467.

This case, of course, provides for a more expansive definition of state-immune federal instrumentalities than does, for example, *Johnson*, supra. It can be argued that, like the Red Cross, AFCIA appears subject to a form of federal control in that Army officers run the Company. Arguably, the exercise of this control constitutes a federal subsidy in the form of free management labor, which subsidy would correspond to the federal subsidy of the Red Cross. We concede that some would say that, like the Red Cross, appellant has a mission which might be said to be calculated to satisfy a national objective, i. e., the business of providing a fringe benefit for some of those in the military. But, unlike the Red Cross, the mission, purpose and existence of AFCIA

has not been authorized by Congress. In response, appellant argues that federal instrumentalities need not be created by statute.

In *Standard Oil Company of California v. Johnson*, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942), the Supreme Court confronted the question of whether or not United States Army Post Exchanges were governmental instrumentalities. It was held that they were, and it was noted that Post Exchanges were originally established pursuant to War Department regulations rather than statutory directives. The Court considered this distinction of no consequence since, "authorized War Department regulations have the force of law." *Standard Oil*, supra, 316 U.S. at 484, 62 S.Ct. at 1170. Although appellant does not cite this case, it does cite the later case of *United States v. State Tax Commission of Mississippi*, 421 U.S. 599, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975), for the proposition that unincorporated entities may be federal instrumentalities. While we have no quarrel with this proposition, *United States v. State Tax Commission*, supra, derives its authority from *Standard Oil* with respect to the post exchanges, and *Standard Oil* is not particularly helpful to appellant in expanding the definition of federal instrumentalities. Unlike the post exchanges in *Standard Oil*, appellant can point to no federal regulations which authorize its existence—at least it does not point to us to any such authorization and we have found none.

Appellant cites us to a law review case note for the proposition that a corporation is exempt from state tax if its authorized purpose is to serve the federal government. The cited authority for that statement is *Clallam County v. United States and United States Spruce Production Corporation*, 263 U.S. 341, 44 S.Ct. 121, 68 L.Ed. 328 (1923). The corporation in Clallam County was formed by the United States to produce "aeroplane lumber" for World War I, with a specific statute sanctioning its formation. Nothing in that opinion even infers support

for the proposition that a corporation formed by volunteers to further a federal objective enjoys immunity from state taxation or regulation.

Appellant cites other instances of federal instrumentalities to show their broad scope, but review of the cited cases shows that the instrumentalities in question were created by statute. E. g., *Kay v. United States*, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607 (1938); *Federal Land Bank of St. Paul v. Bismark Lumber Co.*, 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65 (1941); *New York ex rel. Rogers v. Graves*, 299 U.S. 401, 57 S.Ct. 269, 81 L.Ed. 306 (1937); and *First Agricultural Nat. Bank v. State Tax Commission*, 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968).

Appellant also cites *Ohio v. Thomas*, 173 U.S. 276, 19 S.Ct. 453, 43 L.Ed. 699 (1899), for the proposition that individual army officers, such as those overseeing appellant, may be federal instrumentalities. In that case, appellant, an army officer, was convicted in state court for serving oleomargarine in a disabled soldier's home, in violation of state law. In reversing that conviction, the Supreme Court determined that the appellant was following a Congressional Order in serving the oleomargarine—Congress had made an appropriation for the oleomargarine—and he was immune from state law while carrying out his congressionally authorized tasks. There is an obvious difference between an army officer acting pursuant to legislation and one acting as a volunteer, even if the latter is functioning with the approval of his superiors.

An interesting state case cited by appellant is *Maynard & Child, Inc., v. Shearer*, Ky., 290 S.W.2d 790 (1956). In holding an officers' club to be an "instrumentality of the United States," the Kentucky Court of Appeals emphasized the military supervision and management of these clubs, a point which appellant correctly argues applies to itself as well. However, the Kentucky court also mentioned that the clubs were organized pursuant to War Department regulations; and in the same sentence

in which it held the clubs federal instrumentalities, the court added these qualifications: ". . . unless the proof shows that the association of officers was not in fact an officers' club under the War Department regulations." Id., 290 S.W.2d at 794.

The task before us in examining appellant's claim that it is a federal instrumentality is to determine if the federal supremacy clause of the United States Constitution prevents Wyoming from exercising jurisdiction over appellant. We think the import of the authorities discussed above is that federal immunity applies only to entities or activities authorized by Congress, either directly by statute or indirectly by appropriate federal regulations. Since appellant points to no regulations or statutes authorizing its activity, we conclude that it is not immune from state regulation, despite its intimate affiliation with the military.

## ISSUES NOS. V AND VI

These issues are presented as a collection of positions to the effect that appellant has insufficient contacts with Wyoming to justify regulating, taxing or exercising *in personam* jurisdiction over it. Appellant offers the following line of argument: (1) There are insufficient contacts to justify Wyoming in exercising *in personam* jurisdiction over appellant; (2) but, in any event the requirements which will allow a state to tax and regulate an out-of-state entity are more stringent than the requirements of *in personam* jurisdiction, and appellant's connection with the State of Wyoming does not justify it being taxed or regulated by the state.

The answers to these questions are controlled in the first instance by federal statutory and constitutional law.

## OVERVIEW OF FEDERAL LAW

In 1869, the United States Supreme Court held that the business of insurance was not interstate commerce and, thus, was

properly subject to regulation by the states. *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869). With the exception of certain Fourteenth Amendment restrictions, which will be discussed in detail below, the states were, through this decision, free to regulate insurance. In 1944, the Supreme Court reversed itself and held that insurance business conducted across state lines was interstate commerce. *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). This turnabout prompted Congress to enact, in the following year, the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015. The Act declared "that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of Congress shall not be construed to impose any barrier to the regulation and taxation of such business by the several States." Id. at § 1011. Thus, Congress delegated its newly discovered regulatory powers to the states. In 1962, the Supreme Court, in interpreting the McCarran-Ferguson Act and its legislative history, held that the Act was not an *absolute* delegation of regulatory power to the states. Instead, said the Court, it was the intent of Congress to restrict state regulation to limits imposed by a trilogy of earlier Supreme Court cases. *State Board of Insurance v. Todd Shipyards*, 370 U.S. 451, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962).

The trilogy, which we will discuss in considerable detail, spans the years 1897–1938 and involved due-process limitations, under then-current doctrines, upon the ability of a state to regulate and tax out-of-state insurance companies or out-of-state insurance transactions. Therefore, in deciding whether it is within Wyoming's power to assert jurisdiction over appellant under federal law, we must consider both: (1) whether, under current due-process concepts, appellant has sufficient contact with Wyoming to justify the exercise by Wyoming of jurisdiction over it; and (2) whether the interstate commerce, which is the subject of this ap-

peal, may be regulated and taxed by Wyoming pursuant to the McCarran-Ferguson Act.

For the reasons discussed above, these two different questions will both involve some consideration of the Fourteenth Amendment to the Constitution of the United States.

### Current Due-Process Considerations

■ Appellant has advertised the availability of its insurance in military publications subscribed to by Wyoming residents. (Department of Insurance Findings of Fact). Although some of its Wyoming policy-holders obtained their insurance before coming to Wyoming, others obtained their policies while in Wyoming. (Id.) Unlike the auto retailer and regional wholesaler in *World-Wide Volkswagen Corporation v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), who claimed that their operations were only local, appellant describes its operations in a brochure appended to its brief as "scattered around the globe." Appellant has clearly and successfully—at least until the instant case—sought to do business in Wyoming. Under the well-established "minimum contacts" test of *International Shoe Company v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the United States Supreme Court had decided at least two cases involving an insurer whose contacts with the state asserting forum jurisdiction were no more intensive than appellant's contacts with Wyoming. *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); and *Travelers Health Association v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). As is described in more detail in the next section, "State Authority to Tax and Regulate Appellant," we conclude that appellant has purposefully availed itself of the privileges of conducting activities within Wyoming, e. g., solicitation of Wyoming military personnel by advertisements, as well as personal solicitation by existing members of appel-

lant organization. In *Olmstead v. American Granby Co.*, Wyo., 565 P.2d 108 (1977), we discussed relevant United States Supreme Court cases, including *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), rehearing denied 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92, relied on by appellant, as well as Wyoming law, and concluded that enough of a "persistent course of conduct" or derivation of "substantial revenues from goods consumed within the State" was shown for each out-of-state defendant corporation to allow Wyoming to exercise jurisdiction. We find, for the reasons discussed, infra, that appellant's conduct within Wyoming is sufficient to allow Wyoming to exercise *in personam* jurisdiction over it.

### State Authority to Tax and Regulate Appellant

■ Appellant correctly asserts that the requirements for a state to tax and regulate an out-of-state insurer are more stringent than those justifying the state's exercise of *in personam* jurisdiction over an out-of-state insurer. This brings us to a consideration of the trilogy of cases considered by the Supreme Court in *Todd Shipyards*, supra, as limiting the authority to tax and regulate interstate insurance within the contemplation of the McCarran-Ferguson Act.

The earliest of these three opinions, *Allgeyer v. State of Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897), makes extensive reference to *Hooper v. California*, 155 U.S. 648, 15 S.Ct. 207, 39 L.Ed. 197 (1895). It is, therefore, necessary to consider *Hooper* to fully understand *Allgeyer*. *Hooper* and *Allgeyer* display many similarities, but the Supreme Court reached different results with respect to the constitutionality of the challenged state laws in the two cases. In both *Hooper* and *Allgeyer*, the prosecuting and original-forum states, California and Louisiana, respectively, had laws imposing certain requirements upon out-of-state insurers for the conduct of business within

the state. Both States had statutes which were the focus of the United States Supreme Court appeals and which were clearly calculated to discourage state residents from purchasing insurance from out-of-state insurers who had not satisfied the states' requirements for out-of-state insurers.

The challenged California law provided:

" 'Every person who in this State procures or agrees to procure any insurance for a resident of this State from any insurance company not incorporated under the laws of this State, unless such company or its agent has filed the bond required by the laws of this State relative to insurance, is guilty of a misdemeanor.' " Section 439 of the Penal Code of California, reproduced in *Hooper*, supra, 155 U.S. at 649, 15 S.Ct. at 208.

The challenged Louisiana law provided:

" . . . That any person, firm, or corporation who shall . . . [issue insurance for or obtain insurance from] any marine insurance company which has not complied in all respects with the laws of this state, shall be subject to a fine of $1,000 . . . ." Louisiana Act No. 66 of 1894, reproduced in *Allgeyer*, supra, 165 U.S. at 579, 17 S.Ct. at 427.

In *Hooper*, a California resident sought to obtain insurance from defendant-appellant Hooper, an employee of an insurance brokerage firm operating in California. Pursuant to this request, Hooper's employing firm arranged a contract of marine insurance between a California resident and a Boston firm which had not complied with the California requirements for out-of-state firms. The insurance was paid for in California. Hooper was fined $5.00 for violating the California law, reproduced above, and appealed to the United States Supreme Court.

That Court said:

"The principle that the right of a foreign corporation to engage in business within a State other than that of its

creation, depends solely upon the will of such other State, has been long settled, ..." 155 U.S. at 652, 15 S.Ct. at 209

The Court also said:

"The State of California has the power to exclude foreign insurance companies altogether from her territory, ... She has the power, if she allows any such companies to enter her confines, to determine the conditions on which the entry shall be made ..., and she has also the further right to prohibit a citizen from contracting within her jurisdiction with any foreign company which has not acquired the privilege of engaging in business therein, either in his own behalf or through an agent empowered to that end. The power to exclude embraces the power to regulate, ...

"In the argument at bar it was admitted that, if the contract is to be considered as made in California, then this case is governed by the foregoing principles, ..." 155 U.S. at 655–656, 15 S.Ct. at 210–211.

The Court then considered the role of the California insurance brokerage firm which mediated the contract of insurance between the Boston firm and the California resident. It said:

"If the contention of the plaintiff in error were admitted, the established authority of the State to prevent a foreign corporation from carrying on business within its limits, either absolutely or except upon certain conditions, would be destroyed. It would be only necessary for such a corporation to have an understanding with a resident that in the effecting of contracts between itself and other residents of the State, he should be considered the agent of the insured persons, and not of the company. This would make the exercise of a substantial and valuable power by a state government depend not on the actual facts of the transactions over which it lawfully seeks to extend its control, but upon the disposition of a corporation to resort to a mere subterfuge in order to evade obligations properly imposed upon it ...

\* \* \* \* \* \*

"One more contention remains to be noticed. It is said that the right of a citizen to contract for insurance for himself is guaranteed by the Fourteenth Amendment, and that, therefore, he cannot be deprived by the State of the capacity to so contract through an agent. The Fourteenth Amendment, however, does not guarantee the citizen the right to make within his State, either directly or indirectly, a contract, the making whereof is constitutionally forbidden by the State. The proposition that, because a citizen might make such a contract for himself beyond the confines of his State, therefore he might authorize an agent to violate in his behalf the laws of his State, within her limits, involves a clear *non sequitur*, ..." 155 U.S. at 658–659, 15 S.Ct. at 211–212.

In *Allgeyer*, the defendant-appellant, Allgeyer Co., located in New Orleans, was in the business of exporting cotton overseas. It obtained an open insurance contract to protect its exports, apparently while in transit overseas, from a New York firm which had not satisfied the requirements which Louisiana imposed upon out-of-state insurance companies. Under Allgeyers' arrangement with the insurer, it would order from New Orleans a separate insurance policy for each sale; the policy would be paid for by Allgeyer and delivered to Allgeyer in New York.

The *Allgeyer* opinion begins in this manner:

"There is no doubt of the power of the State to prohibit foreign insurance companies from doing business within its limits. The State can impose such conditions as it pleases upon the doing of any business by those companies within its borders, and unless the conditions be complied with, the prohibition may be absolute ...

\* \* \* \* \* \*

"It is not claimed in this suit that the [New York insurer] . . . [was] doing business within the State." 165 U.S. at 583, 17 S.Ct. at 429.

The Supreme Court concluded that the parties agreed the contract was made in New York. The Court then distinguished *Hooper* because in *Hooper* the contract had been made in the state asserting its regulatory power. The Court said:

"In the case before us the contract was made beyond the territory of the State of Louisiana, and the only thing that the facts show was done within that State was the mailing of a letter of notification, as above mentioned, which was done after the principal contract had been made." 165 U.S. at 587, 17 S.Ct. at 430.

The Court then reproduced from the *Hooper* opinion much of the language we reproduced above from 155 U.S. at 658–659, 15 S.Ct. at 211–212. It then said:

"We do not intend to throw any doubt upon or in the least to shake the authority of the *Hooper* case, but the facts of that case and the principle therein decided are totally different from the case before us. In this case the only act which it is claimed was a violation of the statute in question consisted in sending the letter through the mail notifying the company of the property to be covered by the policy already delivered. We have then a contract which it is conceded was made outside and beyond the limits of the jurisdiction of the State of Louisiana, being made and to be performed within the State of New York, where the premiums were to be paid and losses, if any, adjusted. The letter of notification did not constitute a contract made or entered into within the State of Louisiana. It was but the performance of an act rendered necessary by the provisions of the contract already made between the parties outside of the State. It was a mere notification that the contract already in existence would attach to that particular property. In any event, the contract was made in New York, outside of the jurisdiction of Louisiana, even though the policy was not to attach to the particular property until the notification was sent.

" . . . In this case the company did no business within the State, and the contracts were not therein made.

"The supreme court of Louisiana says that the act of writing within that State, the letter of notification, was an act therein done to effect an insurance on property then in the State, in a marine insurance company which had not complied with its laws, and such act was, therefore, prohibited by the statute. As so construed we think the statute is a violation of the Fourteenth Amendment of the Federal Constitution, in that it deprives the defendants of their liberty without due process of law. The statute which forbids such act does not become due process of law, because it is inconsistent with the provisions of the Constitution of the Union. The liberty mentioned in that amendment . . . is deemed to embrace the right of the citizen . . . to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned." 165 U.S. at 588–589, 17 S.Ct. at 430–431.

In the second trilogy case, *St. Louis Cotton Compress Company v. State of Arkansas*, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297 (1922), a corporation obtained insurance upon its Arkansas property from insurance companies not authorized to do business in Arkansas. The State of Arkansas, pursuant to its statutes, sought to tax such insurance at the rate of five percent. It was apparently accepted as true by the United States Supreme Court that the corporation contracted for and paid for the policies in its domicile in Missouri. On the authority of *Allgeyer*, the corporation challenged the imposition of this tax. Arkansas argued that in *Allgeyer* Louisiana had attempted to

prohibit an insurance contract, whereas all it was trying to do was tax the contract. Justice Holmes said for the Court:

"... But that distinction, apart from some relatively insignificant collateral consequences, is merely in the amount of the detriment imposed upon doing the act. The name given by the State to the imposition is not conclusive. [Citation.] In Louisiana the detriment was $1000. Here it is five per cent. upon the premiums—which is three per cent. more than is charged for insuring in authorized companies. Each is a prohibition to the extent of the payment required. The Arkansas tax manifests no less plainly than the Louisiana fine a purpose to discourage insuring in companies that do not pay tribute to the State. This case is stronger than that of *Allgeyer* in that here no act was done within the State, whereas there a letter constituting a step in the contract was posted within the jurisdiction...." 260 U.S. at 348–349, 43 S.Ct. at 125.

In the final trilogy case, *Connecticut General Life Insurance Company v. Johnson*, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673 (1938), Connecticut General Life Insurance Company was authorized to do business in California. In addition to conducting its business in California, Connecticut General entered into reinsurance contracts concerning California risks with other California-licensed insurance companies. California, pursuant to its laws and constitution, imposed an annual tax of 2.6% on premiums, except those reinsured. Pursuant to its case law, California sought to collect the tax on reinsured premiums from the reinsurer. Connecticut General objected to being subjected to a California tax on its reinsurance of California risks. It claimed that its reinsurance activities took place outside California and were not subject to taxation by California. The Supreme Court agreed. It said:

"Appellant, by its reinsurance contracts, undertook only to indemnify the insured companies against loss upon their policies written in California. The reinsurance involved no transactions or relationship between appellant and those originally insured, and called for no act in California. *Connecticut General Life Insurance Co. v. Johnson, supra* [3 Cal.2d 83], 87 [43 P.2d 278]; cf. *Morris & Co. v. Skandinavia Insurance Co.*, 279 U.S. 405, 408 [49 S.Ct. 360, 361, 73 L.Ed. 762]. Apart from the facts that appellant was privileged to do business in California, and that the risks reinsured were originally insured against in that state by companies also authorized to do business there, California had no relationship to appellant or to the reinsurance contracts. No act in the course of their formation, performance or discharge, took place there. The performance of those acts was not dependent upon any privilege or authority granted by it, and California laws afforded to them no protection." 303 U.S. at 81, 58 S.Ct. at 438.

*Osborn v. Ozlin*, 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074 (1940), must also be considered in understanding *Allgeyer, supra. Osborn* concerned the extent to which Virginia could impose requirements on Virginia risks on interstate companies authorized to do business in Virginia. The Court laid great stress on the fact that Virginia risks were peculiarly tied to Virginia. In upholding the state regulation of state risks, it said:

"In reaching this conclusion we have been duly mindful of the cases urged upon us by appellants. In *Allgeyer v. Louisiana*, 165 U.S. 578 [17 S.Ct. 427, 41 L.Ed. 832], apart from the doubts that have been cast upon the opinion in that case, the state attempted to penalize the making of contracts by its residents outside its borders with companies which had never subjected themselves to local control. Thus the statute was thought to be directed not at the regulation of insurance within the state, but at the making of contracts without...." 310 U.S. at 66–67, 60 S.Ct. at 763.

This line of thought was developed more fully in *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 63 S.Ct. 602, 87 L.Ed. 777 (1943). *Hoopeston*, as does the present case, involved a sort of insurance cooperative. The cooperative effort in *Hoopeston* involved inter-insurance or reciprocal insurance, which the Court defined as "'that system of insurance whereby several individuals, partnerships and corporations underwrite each other's risks against loss by fire or other hazard, through an attorney in fact, common to all, under an agreement that each underwriter acts separately and severally, and not jointly with the other.'" 318 U.S. at 314–315, fn. 1, 63 S.Ct. at 604, fn. 1, citing 58 Central L.J. 323. "[T]he subscriber thus becomes the insurer and the insured." 318 U.S. at 317, 63 S.Ct. at 605.

The issue in *Hoopeston* was whether such reciprocal insurance associations, "whose attorneys in fact are located in Illinois, may constitutionally be made subject to the laws of New York as a condition of insuring property in that state." 318 U.S. at 315, 63 S.Ct. at 604.

The facts in the case were such that the contract was always made in Illinois, and it appears that the administration of the association was there.

In answering the issue affirmatively, the Court said:

"In determining the power of a state to apply its own regulatory laws to insurance business activities, the question in earlier cases became involved by conceptualistic discussion of theories of the place of contracting or of performance. [Footnote reference to *Allgeyer*] More recently it has been recognized that a state may have substantial interests in the business of insurance of its people or property regardless of these isolated factors...." 318 U.S. at 316, 63 S.Ct. at 604.

The Court further said:

"The intimacy of the relation of these insurance contracts to the state of New York becomes even more apparent when it is remembered that the property insured is in the state of New York...." 318 U.S. at 318, 63 S.Ct. at 606.

In arriving at its conclusion the *Hoopeston* Court said:

"The appellants draw counter conclusions from *Allgeyer v. Louisiana*, 165 U.S. 578 [17 S.Ct. 427, 41 L.Ed. 832], and the cases which follow it. While the wisdom of the *Allgeyer* case has occasionally been doubted, it is in any case clearly distinguishable here. In that case, no act was done in the state of Louisiana except that of mailing a letter advising the insurance company of a shipment of goods, the goods themselves were in the state only temporarily, and the insurance company never purported to do business in the state. In the instant case, the reciprocals have the many actual contacts with the New York subscribers and the New York property outlined above, much of the insurance covers permanent immovables, and the reciprocals have been licensed to do business there for years. The *Allgeyer* and subsequent insurance cases have been recently considered in *Griffin v. McCoach, supra* [313 U.S.], at 506, 507 [61 S.Ct. 1023, 1027, 85 L.Ed. 1481] and in *Osborn v. Ozlin*, 310 U.S. 53, 66 [60 S.Ct. 758, 763, 84 L.Ed. 1074]; as the analysis in those opinions clearly indicates, the *Allgeyer* line of decisions cannot be permitted to control cases such as this, where the public policy of the state is clear, the insured interest is located in the state, and there are many points of contact between the insurer and the property in the state." 318 U.S. at 318–319, 63 S.Ct. at 605–606.

And, in the post-McCarran-Ferguson Act case of *Travelers Health Association, supra*, the Court was also confronted with a mail-order insurer who did not have a physical presence in Virginia. That state imposed upon the insurer the requirement that it cease doing business within the state until it agreed to have the Secretary of the Com-

monwealth accept service of process by state claimants. In upholding the Virginia regulation in the post-McCarran-Ferguson Act case, the Supreme Court said:

"In *Osborn v. Ozlin,* 310 U.S. 53, 62 [60 S.Ct. 758, 761, 84 L.Ed. 1074], we recognized that a state has a legitimate interest in all insurance policies protecting its residents against risks, an interest which the state can protect even though the 'state action may have repercussions beyond state lines....' And in *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 316 [63 S.Ct. 602, 604, 87 L.Ed. 777], we rejected the contention, based on the *[Minn. Commercial Men's Ass'n v.] Benn* [261 U.S. 140, 43 S.Ct. 293, 67 L.Ed. 573] case among others, that a state's power to regulate must be determined by a 'conceptualistic discussion of theories of the place of contracting or of performance.' Instead we accorded 'great weight' to the 'consequences' of the contractual obligations in the state where the insured resided and the 'degree of interest' that state had in seeing that those obligations were faithfully carried out...." 339 U.S. at 647–648, 70 S.Ct. at 929–930.

It is finally time to consider the facts of *Todd Shipyards,* supra. In that case the Court held invalid a Texas tax on "premiums paid out-of-state on out-of-state contracts." 370 U.S. at 453, 82 S.Ct. at 1382. The Court characterized the facts as these:

"The insurance transactions involved in the present litigation take place entirely outside Texas. The insurance, which is principally insurance against loss or liability arising from damage to property, is negotiated and paid for outside Texas. The policies are issued outside Texas. All losses arising under the policies are adjusted and paid outside Texas. The insurers are not licensed to do business in Texas, have no office or place of business in Texas, do not solicit business in Texas, have no agents in Texas, and do not investigate risks or claims in Texas.

"The insured is not a domiciliary of Texas but a New York corporation doing

business in Texas. Losses under the policies are payable not to Texas residents but to the insured at its principal office in New York City. The only connection between Texas and the insured transactions is the fact that the property covered by the insurance is physically located in Texas." 370 U.S. at 454–455, 82 S.Ct. at 1382–1383.

In discussing its past decisions, the Court said:

"Prior to the *South-Eastern Underwriters* decision, we had given broad scope to local regulation of the insurance business. *Osborn v. Ozlin,* 310 U.S. 53 [60 S.Ct. 758, 84 L.Ed. 1074]; *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313 [63 S.Ct. 602, 87 L.Ed. 777]...

"Here, unlike the *Osborn* and *Hoopeston* cases, the insurance companies carry on no activities within the State of Texas...." 370 U.S. at 452–453, 82 S.Ct. at 1381–1382.

From the Court's refusal in *Todd Shipyards,* supra, to repudiate *Osborn* and *Hoopeston,* it is apparent that its holding that the McCarran-Ferguson Act incorporated *Allgeyer*; *St. Louis Cotton Compress*; and *Connecticut General,* supra, is a narrow one. The trilogy of cases just recited was given a narrow construction in subsequent cases and this narrow interpretation was emphasized in *Todd Shipyards,* even while the trilogy was deemed to have legislative significance and rescued from earlier hints that the trilogy was obsolete.

Appellant insures 99 Wyoming residents. The instant case arose when a Wyoming mortgage-lender sought a determination of whether appellant's insurance on a Wyoming residence would be legal. Appellant advertises the availability of its insurance in military publications which are subscribed to in Wyoming. In addition, according to appellant's own publication, attached to its appellate brief, members are urged to solicit new members. Indeed, at the Insurance Department hearing, a non-commissioned Air Force officer stationed in Wyo-

ming testified that he bought an AFCIA policy after being encouraged to phone AFCIA's toll-free number by a fellow sergeant. As mentioned, appellant describes itself as a global organization.

In addition, the claims procedure, under the findings of fact of the Insurance Department, suggest considerable activity by the appellant in Wyoming. The Insurance Department found:

"... If there is any dispute as to coverage or the amount owing on the claim, the insured may designate an advisory board of not more than three members of AFCIA, who serve without remuneration, to examine the validity of the claim. If such persons are not available, the claimant may obtain statements from local police or firemen who may have investigated the loss, or he may obtain statements from disinterested witnesses and submit these directly to AFCIA. The claimant may also select and obtain the services of a professional adjuster, at AFCIA's expense, to formulate and prepare his claim if necessary...." Paragraph 8, pp. 6–7 of Findings of Fact.

These facts distinguish and remove the instant case from the *Allgeyer; St. Louis Cotton Compress*; and *Connecticut General* trilogy, supra, and are more closely allied with the *Osborn; Hoopeston*; and *Travelers Health*, supra, line of cases. Appellant-AFCIA clearly solicits business from Wyoming residents by advertising in national publications, and by urging its members in Wyoming and elsewhere to enlist new members—facts either not present or not recognized in any of the trilogy cases. In addition, the claims procedure—a hugely important aspect of any insurance business—contemplates the utilization of AFCIA members in the Wyoming claims-investigating process; and, further, the claims process envisions the hiring of investigators in Wyoming. Both of these essential insurance functions constitute examples of AFCIA activity within the state far beyond the insurance company activities reported in any of the trilogy cases.

Indeed, similar conclusions were reached by the Wisconsin and California Supreme Courts with respect to out-of-state mail order insurers in post-*Todd Shipyards* decisions. *People v. United National Life Insurance Company*, 58 Cal.Rptr. 599, 427 P.2d 199 (1967); and *Ministers Life and Casualty Union v. Haase*, 30 Wis.2d 339, 141 N.W.2d 287 (1966), appeal dismissed 385 U.S. 205, 87 S.Ct. 407, 17 L.Ed.2d 301, reh. den. 385 U.S. 1033, 87 S.Ct. 739, 17 L.Ed.2d 681.

## ISSUE NO. VII

Appellant argues:

"Failure of the Wyoming Insurance Code to apportion the gross premiums tax between in-state and out-of-state activities violates rights of due process and equal protection and renders the imposition of tax and regulation unconstitutional if applied to Appellant. Failure of the Commissioner to rule on this vital point deprived AFCIA of a full hearing and renders the administrative proceeding and order a nullity."

Appellant takes issue with Wyoming's practice of levying its tax on appellant's net Wyoming sales. AFCIA argues that Wyoming is constitutionally required to recognize that much or most of the activity connected with the Wyoming policies occurs outside of Wyoming at appellant's home office and that Wyoming, therefore, must not impose a tax on that portion of a Wyoming premium which represents out-of-state activity.

This argument overlooks the fact that Wyoming has already apportioned its tax on appellant to take into account appellant's non-Wyoming activities. Only appellant's Wyoming premiums are taxed by Wyoming. If Wyoming imposed a corporate income tax, it is entirely possible that Wyoming could constitutionally reach even more than it already has. See, for example, *Mobil Oil Corporation v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 100 S.Ct.

1223, 63 L.Ed.2d 510 (1980). In that case, the Supreme Court upheld, against a constitutional challenge, Vermont's imposition of an income tax upon a portion of Mobil's earnings from foreign affiliates and subsidiaries. Vermont claimed the right to tax a certain fraction of Mobil's total federal taxable income. That fraction was "the arithmetic average of the ratios of sales, payroll, and property values within Vermont to those of the corporation as a whole." 100 S.Ct. at 1227. Mobil did not appeal the fairness of the Vermont apportionment formula; instead it argued that it did not conduct its foreign operations from Vermont and that Vermont was not constitutionally privileged to tax its foreign operations. The fact that the Supreme Court held it proper for Vermont to tax these foreign earnings by virtue of Mobil's conduct of business within the state undercuts appellant's claim that Wyoming must refrain from imposing a tax on the full value of appellant's Wyoming premiums because some of the work relating to the premiums is done without the state.

In *General Motors Corp. v. Washington,* 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964), Washington imposed a tax upon a certain General Motors Division. The tax was based on GM's gross wholesale sales of motor vehicles, parts and accessories delivered in the state. GM challenged the tax on the grounds that because it was levied on unapportioned gross receipts from sales, it was a tax on the privilege of engaging in interstate commerce, was inherently discriminatory, resulted in the imposition of a multiple tax burden and was a deprivation of property without due process of law. The Court began its opinion with a statement of general principles:

"We start with the proposition that '[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their share of state tax burden even though it increases the cost of doing business.' *Western Live Stock v. Bureau of Revenue,* 303 U.S. 250,

254 [58 S.Ct. 546, 548, 82 L.Ed. 823] (1938). . . ." 377 U.S. at 439, 84 S.Ct. at 1567

The Court then said:

"However, local taxes measured by gross receipts from interstate commerce have not always fared as well. Because every State has equal rights when taxing the commerce it touches, there exists the danger that such taxes can impose cumulative burdens upon interstate transactions which are not presented to local commerce. [Citations] Such burdens would destroy interstate commerce and encourage the re-erection of those trade barriers which made the Commerce Clause necessary. [Citation] And in this connection, we have specifically held that interstate commerce cannot be subjected to the burden of 'multiple taxation.' [Citation] Nevertheless, as we have seen, it is well established that taxation measured by gross receipts is constitutionally proper if it is fairly apportioned.

"A careful analysis of the cases in this field teaches that the validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation. For our purposes the decisive issue turns on the operating incidence of the tax. In other words, the question is whether the State has exerted its power in proper proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded. Where, as in the instant case, the taxing State is not the domiciliary State, we look to the taxpayer's business activities within the state, *i. e.,* the local incidents, to determine if the gross receipts from sales therein may be fairly related to those activities. As was said in *Wisconsin v. J. C. Penney Co.,* 311 U.S. 435, 444 [61 S.Ct. 246, 250, 85 L.Ed. 267] (1940), '[t]he simple but controlling question is whether the state has given anything for which it

can ask return.'" 377 U.S. at 440–441, 84 S.Ct. at 1567–1568.

We think that a tax imposed by Wyoming on gross Wyoming premium receipts is constitutionally fair. The Wyoming insurance premiums bear a special and obvious relationship to Wyoming. The cost of the insurance to appellant insurer will naturally depend on the occurrence or non-occurrence of disasters or mishaps in Wyoming. The frequency of such disasters or mishaps will, in part, be determined by the efforts of Wyoming in preventing them. In short, appellant's profit and loss experience in Wyoming will depend on the protections which Wyoming affords appellant's Wyoming insureds. In addition, the lesson to be learned from the *General Motors* case is that the chief consideration in determining the extent of a state's taxing power over an interstate corporation is the necessity to avoid multiple taxation. In *General Motors* the Court stated that the appellant corporation had not shown how its claims of multiple taxation placed a burden on interstate commerce in the constitutional sense. 377 U.S. at 449, 84 S.Ct. at 1572. The Court, therefore, refused to pass on the claim of multiple taxation. In our case, there is no claim that any other state seeks to tax appellant's Wyoming premiums, and appellant has not shown how the tax Wyoming has imposed on it—the same tax it seeks to impose on any other underwriter of Wyoming premiums—burdens interstate commerce.

We hold that Wyoming's failure to apportion the tax on Wyoming premiums to reflect out-of-state activity related to the premiums does not violate the federal constitution.

Appellant includes in this issue an argument that the Insurance Department's failure to rule on this issue invalidates its decision. This contention was answered in our discussion of Issue No. I, where appellant makes the same argument.

### ISSUE NO. VIII

Appellant's eighth argument is:

"Cancellation of Aparacio's coverage instanter without a hearing and prospective cancellation of the now remaining memberships and their coverage constitute impairment of contractual rights, wrongful predecision of the case before hearing, denial of due process and equal protection; furthermore, failure of the Commissioner to consider and rule on this basic point raised before him renders his order of December 27, 1976, a nullity."

This issue and its argument section is sort of a second try at some of the issues raised by appellant in its Issue No. I.

Having spent a fair amount of time treating the various issues raised by appellant in its Issue No. I section, we now review the argument of its Issue No. VIII to see if any material in this latter section compels us to change our minds about our disposition of Issue No. I. It is apparent from both the decision letter of the district court and appellant's brief that the Commissioner "requested" cancellation of the policy. According to appellant's statement of the facts, appellant complied with this request, albeit under protest. Appellant has not presented us authority or cogent argument for the proposition that the Commissioner's "request" was an impairment of contract, nor has appellant pointed us to facts which would lead us to conclude that the request was, in fact, an order. The Amicus Curiae's brief refers to the cancellation as having been ordered, but does not refer us to appropriate citations in the record as required by Rule 5.01(4), W.R.A.P. Therefore, we need not consider the point further. *Dechert v. Christopulos*, Wyo., 604 F.2d 1039, 1044 (1980).

Appellant's argument under this issue also discusses *Allgeyer* and *Todd Shipyards*, supra, cases we have discussed extensively in our discussion of Issues Nos. V and VI.

### ISSUE NO. IX

"AFCIA is exempted from any requirement of a certificate of authority by W.S. 26–3–106."

Appellant cites § 26–3–106(b), W.S. 1977, which provides:

"(b) *Insurer not transacting new business.*—An insurer not transacting new business in Wyoming but continuing collection of premiums on and servicing of policies remaining in force as to residents of or risks located in Wyoming, is transacting insurance in Wyoming for the purpose of premium tax requirements only and is not required to have a certificate of authority therefor. This subsection shall not apply to insurers which have withdrawn from Wyoming prior to May 21, 1955."

In an "Agreed Statement of Facts," it is stipulated that the appellant is now not accepting new policies on Wyoming risks.

A question which occurs to us and is not addressed by the appellant is: For what purpose is appellant's argument advanced? Is it advanced for the purpose of attacking the $5,000.00 penalty imposed by the Insurance Commissioner for appellant's past conduct of business without a certificate of authority? or is it advanced, perhaps, for the purpose of arguing that even if we decide this case adversely to the appellant, appellant should still be allowed to continue servicing its existing policies without obtaining a certificate of authority? Rule 5.01(5), W.R.A.P., requires a conclusion in appellant's brief stating the precise relief sought. Appellant's plea for relief in its brief appears restricted to a request that the Insurance Department's order be overturned and does not appear to contemplate the survival of any portion of the Commissioner's order. Accordingly, we assume that issue of the need for a certificate of authority is raised for the purpose of attacking the $5,000.00 penalty assessed against appellant.

Section 26–3–105(a), W.S.1977, provides:

"(a) No person shall act as an insurer and no insurer shall transact insurance in this state except as authorized by a subsisting certificate of authority granted to it by the commissioner, except as to such transactions as are expressly otherwise provided in this code."

As discussed in Issues V and VI, appellant's Wyoming members were encouraged to solicit eligible Wyoming risks and appellant advertised in national military publications sent into Wyoming. Until the instant proceedings, appellant was doing more than simply servicing existing Wyoming policies; it was seeking new ones. Indeed, § 26–1–110(a) defines transacting insurance to include:

"(i) Solicitation or inducement;

"(ii) Negotiations;

"(iii) Effectuation of a contract of insurance;

"(iv) Transactions of matters subsequent to effectuation and arising out of such a contract."

In light of the above statutory provisions and facts, appellant was, prior to the time this action was commenced, doing more than servicing existing Wyoming policies and, therefore, in violation of the law in failing to obtain a certificate of authority. The penalty was properly assessed against it under § 26–1–115, W.S.1977. (It should be pointed out that this case began before the 1977 re-numbering of our statutes, but the statutes cited had all been enacted prior to the commencement of this case.)

ISSUE NO. X

As its final issue, appellant argues:

"The Commissioner's Decision and Actions herein disregard the rights of AFCIA's members as consumers and fail to follow the spirit of most recently developing law of Consumer Protection."

For lack of relevant authority, we need not consider this issue.

Affirmed.

ARMSTRONG, District Judge, Retired, dissents.